**STATE of Tennessee, Appellee,**

v.

**Michael YOUNG, Appellant.**

Court of Criminal Appeals of Tennessee,
Knoxville.

Nov. 12, 1992.

Permission to Appeal Denied
March 1, 1993.

Lori Ann Lomangino, L. Thomas Austin,
Dunlap, for appellant.

Charles W. Burson, Atty. Gen., and C.
Mark Fowler, Asst. Atty. Gen., Nashville, J.
William Pope, Jr., Dist. Atty. Gen. and James
Michael Taylor, Asst. Dist. Atty. Gen., Day-
ton, for appellee.

*OPINION*

BIRCH, Judge.

Michael Young, the defendant, was indict-
ed for premeditated murder; the jury found
him guilty of second-degree murder. The
trial judge approved this verdict and sen-
tenced Young to imprisonment in the De-
partment of Correction for twenty-five years.

Young appeals as a matter of right. He
challenges his conviction on three grounds:
(1) that the convicting evidence was as a
matter of law insufficient to support the
jury's verdict, (2) that the jury's verdict was
impeached by extraneous prejudicial infor-
mation imparted during the trial, and (3) that

the trial judge erred reversibly in admitting certain evidence.

We find no reversible error; we affirm the judgment.

## I

The record establishes that Jerry Johnson, the victim, discovered Mitchell Burgess trespassing on his property attempting to harvest some marijuana plants. During this confrontation, Johnson either shot or hit Burgess in the neck. The ill will between the two men escalated. In the ensuing weeks, Burgess, aided by the defendant, committed numerous acts of vandalism against Johnson's property. On one occasion, Burgess and the defendant slashed seventeen tires on the Johnsons' vehicles parked on Johnson's property. On another, Young stole a shotgun from Johnson's truck. In the dawn of September 15, 1987, Burgess and the defendant drove to Johnson's house. Johnson emerged from his house into his driveway, and the defendant shot Johnson with a high-powered rifle. Johnson's son saw Burgess fleeing the scene immediately after the shooting. Johnson died before emergency medical personnel arrived. Ballistic evidence established that Johnson had been shot with a .30–.30 caliber rifle.

Charles Hodge testified that, a week before the killing, Mitchell Burgess, Keith Burgess, and another man came to his house and discussed killing Johnson. Young, who arrived soon after the three men left, said "Mitchell wouldn't do nothing, that he [Young] would do it." Finally, there was testimony from Wayne Hodge, Charles Hodge's son, that Young gave a .30–.30 rifle to him. When Burgess saw the weapon, he snatched it away from Wayne Hodge. Burgess returned the weapon to Wayne Hodge a week later saying, "Here, you can have this gun. It ain't the one I thought it was."

The defendant testified in his own defense. Also, he produced an alibi witness and several other individuals whose testimony tended to support the defense theory that Young was not present when the crime was committed.

## II

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832 (Tenn.1978). This court must view the evidence in the light most favorable to the state and can set aside Young's conviction only if the evidence is insufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle,* 639 S.W.2d 913 (Tenn.1982).

■ It is not the function of this court to reweigh evidence adduced at a criminal trial. A guilty verdict, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in testimony in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627 (Tenn. 1978).

■ After viewing all of the evidence in the light most favorable to the state, we hold that any rational trier of fact could have found the essential elements of the crime of second-degree murder committed by the defendant beyond a reasonable doubt. We hold, therefore, that the convicting evidence is legally sufficient. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. at 307, 99 S.Ct. at 2783; *State v. Williams,* 657 S.W.2d 405 (Tenn.1983).

## III

■ The defendant contends that the jury's verdict was tainted by extraneous information imparted to one or more of the jurors during the trial. At approximately 11:30 p.m. on November 15, 1990, an officer [1] into whose charge the jury had been commit-

1. This officer was Greg Johnson, then the Circuit Court Clerk of Bledsoe County.

ted telephoned the trial judge and informed him of the receipt of a telephone call which instructed him to "get the jury out of the hotel." On the next day, there was a telephone threat to blow up the courthouse. The trial judge informed counsel of these developments, ascertained that no officer had informed the jurors of the threat, and invited both counsel to go on the record concerning this matter. Counsel were apparently satisfied that no juror knew of the threat, and they acquiesced in the trial judge's expressed reluctance to declare a mistrial. Apparently, other bomb threats were received, but the trial judge worked assiduously to prevent jurors from learning about them, even to the point of offering explanations that were necessarily uncandid and unclear.

We note parenthetically here that Greg Johnson, the Circuit Court Clerk since removed, was indicted upon three counts of circulating false reports of an impending bombing,[2] one of which pertains to the bomb threats described above. Johnson was granted pre-trial diversion on these charges.

In his motion for new trial, the defendant sought to impeach the jury's verdict, claiming that it was influenced by extraneous information: that is, the bomb threats. The trial judge interrogated the jurors along lines prescribed by *State v. Blackwell*, 664 S.W.2d 686 (Tenn.1984), and Rule 606(b), Tenn.R. of Evid.

In *Blackwell*, the Supreme Court adopted Rule 606(b) of the Federal Rules of Evidence and defined the type of evidence admissible from a juror to impeach a jury verdict. This holding, subsequently established as Rule 606(b) of the Tennessee Rules of Evidence, prohibits a juror from giving testimony on any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon a juror's mind or emotion as influencing his or her vote except that a juror may testify on the question of whether any extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

In construing Rule 606(b), federal courts hold that upon proof that a juror has received extraneous information, there arises a rebuttable presumption of prejudice, and the burden then shifts to the prosecution to explain the conduct or to demonstrate the harmlessness of it. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States ex rel. Tobe v. Bensinger*, 492 F.2d 232 (7th Cir.1974); *Richardson v. United States*, 360 F.2d 366 (5th Cir.1966).

Of the twelve jurors interrogated by the trial judge, five admitted having heard of threats or having noticed unusual activity. Upon further interrogation, each of the five assured the trial judge that neither the threats nor their perceptions of irregularity had affected their verdict.

Similarly, the three persons who had been sworn to take charge of the jury were questioned. The testimony of two of these persons clearly shows that neither imparted any improper information to any juror, nor did either observe anyone else do so. The third person was Greg Johnson. He asserted his Fifth Amendment privilege and refused to answer any nocent question put to him.

After a full evidentiary hearing, the trial judge was convinced that the events had been sufficiently explained and that the defendant, in any event, had not been prejudiced.

In these circumstances, the trial judge was in the best position to make this determination. Likewise, the trial judge was best able to assess the nature of the extraneous information, as well as its effect, if any, upon the jury. Indeed, the trial judge addressed the matter in an exemplary manner, especially in light of the fact that this was a high-profile trial which generated great interest and much tension. We note, as an aside, that trials have proceeded uninterrupted even in cases where the trial judge informed the jury of a bomb threat, and verdicts reached under those circumstances have survived impeach-

2. T.C.A. § 39–16–502.

ment attempts.[3] Thus, we are most reluctant to curtail the trial judge's traditionally broad discretion in managing juries and in responding to potentially explosive circumstances.

■ Findings of fact made by the trial judge after an evidentiary hearing are afforded the weight of a jury verdict unless the evidence contained in the record preponderates against his findings. *State v. Killebrew,* 760 S.W.2d 228 (Tenn.Crim.App.1988).

We are satisfied that the trial judge reached the proper conclusion; we overrule this issue.

## IV

■ The defendant asserts that the trial judge erred prejudicially in admitting certain evidence. The evidence in question consists of a portion of the testimony of Charles Hodge, a witness for the prosecution. As Hodge was being questioned on direct examination about a conversation he had with Burgess, the examination went like this:

Q Mr. Hodge, I'll asked you on that same day and date, did Michael Young, the defendant, in this case come to your premises?

A Yes, sir.

Q Was he there at the same time Mitchell was there, before or after?

A He come after Mitchell left.

Q Now I'm going to put these questions in reverse order and asked the court to rule on it, but let me go with one point and answer it the way I asked it, okay?

A Yes, sir.

Q After Mitchell Burgess had left your premises, your property, that being your house, how long thereafter was it before Michael Young came to your house?

A Maybe five (5) or ten (10) minutes after they left.

Q In the course of whatever conversation you had with Michael Young at that time and don't say what now, but just answer my question, did you relate to Michael Young certain things that Mitchell Burgess had said?

A Yes, sir.

Q What did Michael Young, the defendant, respond, what did he say about things you had told him that Mitchell Burgess had said?

A He said that Mitchell wouldn't do nothing that he would do it.

Q That he would do it?

A Yes, sir.

Q Why did he say that Mitchell wouldn't do whatever Mitchell had said he was going to do?

A Said he didn't have the nerve to do it.

At this point, the district attorney general requested a ruling from the court as to the admissibility of that part of Burgess' statement to Hodge that Hodge had relayed to Young, thereby precipitating the response already in evidence. The defendant objected, although he stated no grounds. The objection having been overruled, the examination continued:

Q What had Mitchell Burgess, now with that said and done of what Mr. Young response was, what had Mitchell Burgess said in your presence before they had left your premises sometime before that, what had Mitchell Burgess said that you related to Michael Young?

A That he has said that—about what was going to go on?

Q Yes.

A Well, that was when Mitchell, I'm talking to Mitchell, right?

Q Mitchell Burgess, yes, sir.

A Well, Mitchell was talking about not let that happen no more what had happened to him before.

Q What had happened to him?

A Mr. Johnson was suppose to have shot him in the back of the neck.

Q What had Mitchell said he was going to do about it?

3. *Purnell v. Lord,* 952 F.2d 679 (2nd Cir.1992); *United States v. Arciniega,* 574 F.2d 931 (7th Cir.Ct.App.1978).

A  He just said he wouldn't let it happen again.

Q  Did he make any threats?

A  Mitchell never made a threat, not at that time.

Q  Was there any coin flipping between these various men that you have just named?  Now not Mr. Young, we know he wasn't there at that time, but was there any coin flipping going on at the same time Mitchell Burgess made this statement?

A  Yes, sir, about the same time.

Q  And who were involved in the coin flipping?

A  It was Mitchell Burgess and Keith Burgess and I don't know the other man's name.

Q  Some fellow you don't know.

A  They was three (3) of them.

Q  What were they flipping for?

A  To see who would shoot Jerry Johnson.

Q  Because of what had happened to Mitchell Burgess sometime before?

A  Yes.

Q  Did you see any evidence of anything about the head of Mitchell Burgess, Charlie, of something that he purported had been done to him by Jerry Johnson?

A  He had a patch on the left side of his neck, said that's where Jerry had shot him.

Portions of Hodge's testimony do constitute hearsay and, perhaps, would best have been excluded.  Even so, Burgess testified for the state and was subjected to a rigorous cross-examination by the defendant's lawyer. Any error in the admission of this evidence is harmless, at best.  This issue is without merit.

Accordingly, the judgment of the trial court is, in all things, affirmed.

SCOTT, P.J., and JONES, J., concur.