IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
JANUARY 2000 SESSION

## STATE OF TENNESSEE v. LARRY S. BRUMIT

**Appeal from the Criminal Court for Rutherford County**
**No. F-34370B     James K. Clayton, Jr., Judge**

_____

**No. M1999-00154-CCA-R3-CD  -  Decided April 28, 2000**

_____

The Defendant was convicted in the Rutherford County Circuit Court of two counts of first degree murder and one count of conspiracy to commit first degree murder, and he appealed. Court of Criminal Appeals, Welles, J., affirmed, holding that the evidence was sufficient to support the convictions; the trial court did not err by denying Defendant's motion for mistrial concerning jury contamination; the trial court properly ruled on evidentiary issues; violation of the rule of sequestration did not result in prejudice against the Defendant; the trial court did not err by denying the Defendant a free transcript of his co-defendant's trial; and the sentence imposed was proper.

**T. R. A. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

JUDGE DAVID H. WELLES delivered the opinion of the court, in which JUDGE THOMAS T. WOODALL and SENIOR JUDGE L.T. LAFFERTY joined.

Larry S. Wallace, LaVergne, Tennessee, for the appellant, Larry S. Brumit.

Paul G. Summers, Attorney General and Reporter, Mark E. Davidson, Assistant Attorney General, William C. Whitesell, Jr., District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On August 10, 1995, the Rutherford County Grand Jury indicted the Defendant, Larry S. Brumit, on two counts of first degree murder and one count of conspiracy to commit first degree murder. Following a jury trial conducted in September 1996, the Defendant was convicted of all three charges. The trial court sentenced the Defendant as a Range I standard offender to life with the possibility of parole for each count of first degree murder and to twenty-five years for conspiracy to commit first degree murder. The trial court ordered that the twenty-five year sentence be served consecutively to the Defendant's sentences of life with the possibility of parole and to other previous sentences. Pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure, the Defendant now appeals. We affirm the judgment of the trial court.

On appeal, the Defendant presents the following issues for our review: (1) whether the evidence presented at trial was sufficient to sustain the Defendant's convictions, or alternatively, whether the trial court properly affirmed the verdict when acting as thirteenth juror; (2) whether the trial court erred by failing to grant the Defendant's motion for mistrial concerning jury contamination; (3) whether the trial court erred by allowing improper witness testimony; (4) whether the trial court made improper rulings on various objections throughout the course of the trial, thereby denying the Defendant a fair trial; (5) whether contact between a testifying witness and members of a victim's family, one of whom also served as a witness, prejudiced the Defendant to such a degree that he was denied his right to a fair trial; (6) whether the trial court improperly denied the Defendant a complete transcript of his co-defendant's trial; and (7) whether the prosecutor's remarks during sentencing "inflamed the trial judge so as to prejudicially affect the [D]efendant's sentence" and whether the sentence imposed was proper.

The charges in this case stem from the shooting deaths of two victims, James Albert "Bubba" Summar, II, and Brian Anthony Bettis. On Wednesday, May 24, 1995, both victims were discovered dead behind a trailer located on Liberty Gap Road in a remote area of Rutherford County. At trial, Detective Ben Bennett of the Rutherford County Sheriff's Department testified that prior to his death, Bubba Summar had been working as a police informant following his own arrest for the sale of marijuana. While working for police, Summar was involved in the investigation and subsequent indictment of Wayne Cartwright for the sale of marijuana. Bennett testified that Cartwright was indicted in May 1995. He stated that the investigation resulting in the indictment against Cartwright was extensive and involved other targeted individuals. Bennett stated that neither the Defendant nor his co-defendant, Mike Rhodes, were targeted in the investigation, but he reported that acquaintances of the two had been subjects of the investigation. Bennett also reported that Bubba Summar would have been called to testify against Cartwright had he not been killed.

Doug Bicknell, Bubba Summar's second cousin, testified about Summar's relationship with the Defendant and his co-defendant, Mike Rhodes. Bicknell reported that he and Summar had bought marijuana from and sold marijuana to Rhodes. He recalled that before his cousin's death, they saw Rhodes often, at least once every other day, and he testified that they "part[ied]"

2

together at the trailer where Summar's body was later found by police. Bicknell testified that he met the Defendant through Rhodes and began to see the Defendant "[a] couple of times a week." He testified that he, Summar, Rhodes, and the Defendant were all part of the same social group. He stated that the Defendant had witnessed drug transactions within the group and reported that he had seen the Defendant smoke marijuana with the group.

Bicknell testified that Rhodes and the Defendant had a close relationship, but that Summar and the Defendant "didn't like each other." He claimed that the Defendant "thought [Summar] was a punk." Bicknell also testified that he, Rhodes, and Summar had shot guns together. He stated that Summar shot with his right hand and generally carried his gun in the front of his pants. He stated that Summar did not use a holster.

Bicknell also reported that he and Summar, who was living at the Liberty Gap Road trailer in 1994, were growing marijuana together on the property where the trailer was located. He stated that Summar was later arrested in connection with the marijuana. Bicknell testified that he, Summar, and the Defendant all worked for Rhodes during this period of time. Bicknell stated that he left his job with Rhodes to work for Brentwood Log Homes and later "got [the Defendant] a job with them."

After the Defendant began to work for Brentwood Log Homes, Bicknell, the Defendant, and other employees were sent to Ohio to build a log house, where they stayed at the same motel. Bicknell recalled an incident involving the Defendant that occurred while they were in Ohio: He and the other Brentwood Log Homes employees were sitting in the motel room drinking one day, and the Defendant and another employee "were talking about Bubba [Summar] being a snitch." Bicknell recalled that when he defended his cousin, the Defendant "said that he would see that the little punk would get what was coming to him." Bicknell reported that he "told [the Defendant] if he messed with my cousin, me and him would have dealings," and the Defendant "said he was getting too old for all that fighting." Bicknell testified that the Defendant then "reached in his bag and pulled his gun and said he let his gun do his fighting for him."

Martin Rhodes, co-defendant Mike Rhodes' brother, testified that he was acquainted with Wayne Cartwright. He stated that someone, "supposedly Wayne," had dropped off copies of the indictment against Cartwright at his home a couple of days before the deaths of Summar and Bettis. Summar was named in the indictment. After receiving copies of the indictment, Martin Rhodes "told everybody that [he] knew . . . [b]ecause [Cartwright] was supposed to be a friend of [his]." He recalled that he gave a copy of the indictment to his brother, Mike Rhodes, who "didn't believe it." He stated that he spoke to his brother the evening before the murders, and during their conversation, Mike Rhodes said that he was to meet with Bubba Summar to discuss "what had happened that night before." Martin Rhodes testified that when he spoke with his brother later that night, Mike Rhodes said that Summar had agreed to meet with him at the trailer on Liberty Gap Road. Martin Rhodes testified that he called the trailer at approximately 6:00 p.m. on May 24, 1995 and spoke with his brother, who answered the phone. He stated that he next saw his brother at approximately 11:00 p.m. that night at his home, at which time his brother informed

3

him that Summar and Bettis were dead. Martin Rhodes testified that he immediately burned his copy of the Cartwright indictment after hearing this news because he "didn't want nothing to do with it." He further testified that on the occasions when he saw his brother on the day of the shootings, his brother was intoxicated. He reported that the next day, his son, who knew Kelly Bettis, Brian Bettis' wife, called her to tell her that they had heard over a police scanner that two men had been killed at the trailer. He stated that he and his son then went to the Bettis residence because Ms. Bettis "was all tore up about it."

Martin Rhodes also testified that Mike Rhodes owned two handguns during the period of time surrounding the victims' deaths, a ".44 and a .25 or .22 automatic." He reported that he had seen the Defendant with a .38 caliber pistol. He testified that he had once believed Brian Bettis to be a "cop." When asked whether he had known Bettis to carry large amounts of money, Rhodes stated, "I've never seen it, but he was a gambler. He had money to bet with . . . ."

Kelly Bettis, victim Brian Bettis' wife, testified that she had met victim Summar, co-defendant Mike Rhodes, and the Defendant, and she reported that her husband had also known the Defendant. She described the events of May 24, 1995 as follows: She stated that her husband arrived home from work at approximately 5:00 p.m. with friends, one of whom was Bubba Summar. He and Summar arrived in a Ford Ranger pick-up truck. While at her home, Summar received a phone call from Mike Rhodes and afterwards told Brian Bettis that "he had to go because Mike was waiting." They then "got ready to go," and Summar put a 9mm handgun, which he had been carrying that day but which belonged to Brian Bettis, under the passenger seat of the truck. She stated that the gun was in a holster when Summar put it under the seat of the truck. Bettis testified that although her husband had carried a gun on previous occasions when he had visited the trailer, he was not carrying a gun on the night of his death.

Bettis stated that her husband came outside to the truck, told her he was hungry, and gave her a fifty-dollar bill from his front right pocket. She testified that her husband always carried his money in his front pocket and reported that "[h]e had a lot of money" at that time, estimating the amount to be "hundreds." He asked her to get food and told her he would return in a couple of hours.

Bettis estimated that Summar and her husband left her home at approximately 6:00 p.m. She stated that it took between forty-five minutes and an hour to drive to the trailer from her home. After they left, she went to the store, came home, and cooked dinner. At 9:00 p.m., after her son had gone to bed, she began to call the trailer. She stated that she "called out to the trailer all night," but there was no answer. At approximately 7:00 a.m., Josh Summar, Bubba Summar's younger brother, called her, and she asked him to drive out to the trailer to see what had happened. She did not hear back from Josh Summar, but she received a phone call at approximately 2:00 p.m. from Martin Rhodes, Sr., who told her that Summar and her husband had been killed. She called the sheriff's department, and soon Martin Rhodes, Sr. and Martin Rhodes, Jr., neither of whom she knew, arrived at her home. A chaplain sent by the sheriff's department arrived shortly thereafter.

4

Annette Rigney testified next. She stated that her husband was the Fosterville Volunteer Fire Department fire chief. She recalled that shortly before 8:00 p.m. on May 24, 1995, she saw Bubba Summar, whom she knew, drive by the Fosterville Fire Department in a truck. She stated that the truck was headed towards Liberty Gap.

Josh Summar, Bubba Summar's brother, also testified at trial. He recalled that he first met the Defendant in 1994 at a party at Mike Rhodes' house. He testified that Rhodes and his brother had sold marijuana together and that the Defendant was present during some of the drug transactions, although he never saw the Defendant directly involved in any of the transactions. He stated that these transactions occurred when his cousin, Doug Bicknell, his brother, and the Defendant were living together at Rhodes' house. According to Josh Summar, the Defendant and Bubba Summar did not like each other and refused to speak to one another while they lived together.

Summar testified that his brother practiced target shooting at the property where the trailer was located. He recalled having seen Bubba Summar shoot a 9mm pistol, a .38 caliber pistol, a .25 caliber pistol, and a .12 gauge "sawed-off [shotgun with a] pistol grip." He stated that his brother shot with his right hand. He further testified that his brother often carried a pistol on his person, usually either a 9mm pistol or .25 caliber pistol, both owned by Brian Bettis. Summar stated that his brother generally carried guns in his pants. He explained that his brother kept his gun in a holster when it was stored under the seat of a vehicle, but removed it from the holster whenever he carried it on his person. Summar identified the holster found on his brother's body as the holster which he had seen under the seat of Bettis' truck on the night of the murders.

Josh Summar summarized the events of May 24, 1995 as follows: He worked with his brother, Bettis, and others during the day. At approximately 3:00 p.m., Bubba Summar received a phone call and then told Bettis that they were to meet Rhodes at the trailer. After work, they went to the Bettis home, and Bubba Summar received another phone call. He emerged from the house and told Bettis that they needed to leave to meet Rhodes. Bubba and Josh Summar put a box containing between a half-pound and a pound of marijuana in the bed of the truck. Josh Summar stated that his brother never carried that quantity of marijuana "unless he was going to get rid of it." Josh Summar testified that when they left, Bettis and his brother had at least one gun, a 9mm pistol, under the seat of the truck, and there was a set of stairs in the truck bed that they planned to attach to the back of the trailer.

The following morning, Josh Summar was awoken by his father, who could not find Bubba Summar. Josh Summar called Kelly Bettis, who was crying and asked him to go to the trailer to determine what had happened. Josh Summar and a friend drove to the trailer on the morning of May 25, 1995 at approximately 9:00 a.m. and first discovered the body of Brian Bettis lying next to the truck. Summar stated that he "freaked [and] went and got back in [his] car and tried to find [his] dad because [he] didn't know what to do." Unable to find his father, he went to his grandparents' house. His grandmother called the police while his grandfather accompanied him to the trailer. After seeing Bettis' body, his grandfather went into the trailer, where he found

several beer and liquor bottles. His grandfather asked Josh Summar to throw them away, and as he left the trailer to dispose of the bottles, Summar discovered his brother's body. He stated that his brother was lying on his side with a holster attached to his shorts. He testified that the holster was clipped to the shorts backwards, and he stated that he had never seen his brother wear a holster in such a manner. On cross-examination, Summar acknowledged that in his statement to police, he admitted that he thought his brother might have shot Bettis, "that they might have got into it and that that could have happened."

Tabitha Rhodes, the wife of Mike Rhodes, testified that she and her husband were in the process of obtaining a divorce at the time of trial. She also stated that she had known the Defendant for approximately four years. She reported that her husband had been involved in "the circle," which she defined as "a group of people who deal marijuana together." She testified that the Defendant was not involved in the group but that the Defendant was "around it." She also recalled having seen the Defendant use marijuana.

Rhodes testified that she knew Bubba Summar, whom she described as "real, real close to [her family]." She stated, "He was like part of the family." She testified that on the night before Summar's death, she found out from her brother-in-law, Martin Rhodes, that Summar was a police informant. She recalled that when her husband discovered this information, he "was tore up. He was shocked, very surprised. He couldn't believe [Summar] would do something like that." According to Rhodes, her husband expressed concern that Summar and the police might be "set[ting] up" another member of "the circle."

Rhodes described the evening of May 24, 1995 as follows: Her husband arrived home in the late afternoon and talked for approximately twenty minutes with visitors who pulled into their driveway. When her husband entered the house, he was "drunk." At some point that afternoon, the Defendant stopped by to visit Rhodes, and they went into the kitchen to talk about going to the trailer. Rhodes intended to "throw[] . . . out" Allen Daugherty, the resident of the trailer at the time, and the Defendant agreed to accompany Rhodes to the trailer. As they were leaving, Tabitha Rhodes "joking[ly]" told her husband, "don't go up there and . . . get crazy and kill nobody."

Rhodes and the Defendant left in Tabitha Rhodes' station wagon and arrived back at the Rhodes' home at approximately 9:30 p.m. They pulled into the driveway "pretty quick," startling Tabitha Rhodes, who went to the door to see who had arrived. She stated that when she got to the door, Mike Rhodes was "rustling around in the floorboard" of the car, and the Defendant "darted out to his car and left." Mike Rhodes then "went to the woods" behind their home and returned about fifteen minutes later. She stated, "He was pretty upset." Mike Rhodes talked to his wife about what had happened and left their home, returning late during the night.

Tabitha Rhodes testified that she later asked the Defendant what had happened at the trailer on the night of the shootings, and the Defendant told her "it did not have to happen that way, that they drew on him first and he did what he had to do." She also testified that almost a

week later, her husband asked her to dispose of the telephone from the trailer, and she did so by throwing it off a bridge. Finally, she testified that almost a year after the murders, she found Bubba Summar's wallet in the woods behind her house. She reported that her cousin subsequently burned it.

Rhodes maintained that the Defendant's statement to her concerning what had happened on the night of the murders did not change the impression that her husband had previously given her. However, she claimed that when she found the wallet, her impression of that night began to change. She testified that she was unsure at the time of trial what had happened at the trailer, but stated on cross-examination that she was "angry with [her husband] because he lied to [her]."

Donald Ivey, the Defendant's roommate at the time of the murders, recalled that on the evening of May 24, 1995, he was in his room watching television when the Defendant returned home. He stated that he heard someone start the washing machine and then turn on the bathtub faucet. Shortly thereafter, he saw the Defendant in the kitchen and jokingly asked him, "Did you kill somebody tonight?" According to Ivey, the Defendant stopped what he was doing, looked at him, and said nothing. Ivey retreated to his bedroom. Later, Ivey again asked the Defendant, "Did you kill somebody?" This time, the Defendant responded, "You can't help being in the wrong place at the wrong time; can you?" At trial, Ivey stated, "I don't know if he was joking with me or not."

Detective James Harrell of the Rutherford County Sheriff's Department introduced videos which he had recorded of the crime scene. He testified that after taping the scene, he went into the trailer and recovered a shotgun. He stated that he found the shotgun under the couch, and when he ejected it, a spent shell fell from the gun; Harrell was unsure whether it came from the magazine or the chamber of the gun.

James E. Gage, who was a lieutenant detective for the Rutherford County Sheriff's Department at the time of the murders, testified that he investigated the deaths of Bubba Summar and Brian Bettis. He stated that on June 6, 1995, he recovered a 9mm pistol from the wooded area behind Mike Rhodes' house after Rhodes disclosed the location of the pistol. Gage also testified that he was present at the autopsy of Bubba Summar and witnessed the state medical examiner, Dr. Charles Harlan, remove a bullet from Summar's neck. He stated that he submitted both the bullet and the 9mm gun, which was believed to have been in Bubba Summar's possession on the night of his death, to the Tennessee Bureau of Investigation's Crime Laboratory for testing. Results from tests performed on the items indicated that the bullet could not have been fired from the gun. Special Agent Steve Scott of the TBI testified that he examined the 9mm pistol and bullet submitted by Detective Lieutenant Gage. He concluded that the bullet could only have been fired from a .38 special or a .357 magnum handgun. He testified that he also examined the shotgun recovered from the trailer and concluded that the spent shell which Officer Harrell saw fall from the shotgun had most likely come from the barrel of the gun, rather than from the magazine.

Gage also testified about other evidence found at the crime scene. He reported that he was called to the scene at approximately noon on May 25, 1995, and he passed the Fosterville Fire Department on his way there. He described the location of the trailer as "very secluded," "isolated," and enclosed by woods. He reported that the trailer was owned by the Summar family, leased to Mike Rhodes, and subleased to Allen Daugherty, who was then living in the trailer with Bubba Summar. He testified that in the woods near the trailer, officers found marijuana plants and shell casings from several different weapons, none of which were significant to the officers' investigation of the case and which Gage attributed to target shooting.

Gage testified that at the time he arrived at the scene, Bettis' truck was still running. He stated that there were two soft drink bottles setting upright in the bed of the truck. He explained that the bottles were significant because it was doubtful that the bottles would have remained in an upright position in the bed of the truck had they been there during the drive to the trailer; he explained that the roads to the trailer were "rocky" and "very rough." He therefore assumed that the bottles had been placed in the bed of the truck after the truck arrived at the trailer site. Gage also stated that officers found steel stairs in the bed of the truck and a box of marijuana in the cab of the truck between the seats.

Gage testified that Bettis' body was found outside the driver's side of the truck and that Summar's body was found outside the passenger's side of the truck. Officers found a dime on the ground near Bettis' body. Gage explained the significance of the dime, stating, "as tight as [Bettis'] jeans were, it appeared . . . that someone had entered that pocket." He testified that two one-hundred dollar bills were found in Bettis' front left pocket. Gage also described the holster found on Summar's body, stating that although it was "an inside the pants holster," it was found clipped backwards to the outside of Summar's shorts. He demonstrated to the jury the difficulty of retrieving a gun from a holster clipped in the same position to his own pants and stated that a right-handed shooter would have to turn his hand around to reach the gun. Gage stated that although no guns were found at the scene, Mike Rhodes led them to a 9mm handgun, which was wrapped in "two blue shop rags" and placed at the base of a tree in a wooded area behind his house; officers later discovered that the gun belonged to Brian Bettis. Gage also testified that officers recovered Bettis' wallet from the truck but that Summar's wallet was never recovered.

In addition, Gage testified concerning phone records which corresponded with Brian Bettis' cellular phone. He stated that the last call made from the phone on May 24, 1995 was to the trailer; he stated that the call occurred at 7:32 p.m. and lasted two minutes. In addition, he reported that officers were unable to locate the phone which had been inside the trailer.

Gage testified that he attended the autopsies of both victims. He stated that although Brian Bettis suffered two gunshot wounds to the head, an entry and an exit wound, the bullet which caused the wounds was never recovered. He testified that Bubba Summar suffered one gunshot wound to the neck and that a bullet was recovered from Summar's body. Gage stated that the bullet was fired from a .38 caliber revolver, but reported that despite an extensive search, a .38 caliber revolver matching the bullet which killed Summar was never found. He testified that the

Defendant informed police that the murder weapon had been thrown from a car and assisted in a search for the weapon, but the weapon was never recovered.

In addition to photographs of the crime scene, Gage introduced a videotape of interviews he conducted with the Defendant shortly after the murders. During the interviews, the Defendant did not deny being present at the trailer at the time of the victims' deaths. However, the Defendant stated, "I didn't shoot those boys," insisting instead that Mike Rhodes killed both victims. The Defendant maintained that he was standing near the trailer when the victims were shot, and he presented two different versions of the order of the murders: Initially, he claimed that Summar was killed first because he had a weapon, and later he claimed that Bettis was killed first. According to Gage, the Defendant indicated that Bettis was also armed. Gage testified that both the Defendant and Mike Rhodes initially lied to him about being at the trailer on the night of the murders, each tried to blame the other, and both attempted to assert that the shootings occurred in self-defense. Gage testified that after the second interview, the Defendant drove with police to the Fosterville area, where the Defendant confirmed "the get-away route" previously identified by Mike Rhodes. The Defendant also told officers that there was one "murder weapon" and directed officers in a search for it. Gage stated that the Defendant asked him whether the officers had found fingerprints and indicated that if they found the murder weapon, they would find fingerprints.

Finally, Gage introduced an audio tape recorded in a patrol car in which the Defendant and Mike Rhodes were riding. On the tape, the Defendant said to Rhodes, "If nothing had ever been said, we'd be walking out today." At another point, Mike Rhodes said to the Defendant, "What are we doing, man? Are we going to fight each other? Larry, I don't want to do that." The Defendant later said to Rhodes, "You know, if anything came out, it was more or less your mess." He also stated, "What was originally agreed on was if they had me, that you would take responsibility."

Medical examiner Charles Harlan testified that he performed autopsies on both victims in this case. He stated that Summar died of a "near gunshot wound" to the neck that was fired from between four and six inches from the skin's surface. He reported that the bullet which killed Summar was either a .38 or .357 caliber bullet. He stated that the bullet entered Summar's body in such a manner as to sever the spinal cord, causing "essentially instantaneous unconsciousness." Harlan testified that he found no "defensive wounds" on Summar's body. He reported that at the time of his death, Summar had a blood alcohol content of .03 grams percent and that his blood contained trace amounts of diazepam and nordiazepam; in addition, a urine drug screen performed on Summar indicated the presence of tetrahydrocannabinol, the active ingredient in marijuana. Harlan maintained that the low amounts of alcohol and drugs in Summar's body would have had little or no effect on his ability to function.

Harlan testified that Bettis died of a "distant gunshot wound" to the head, which he defined as a shot fired from a distance of greater than twenty-four inches. He described two gunshot wounds on Bettis' body, an entry wound on the right side of the head and an exit wound

9

on the left. Harlan stated that the bullet which killed Bettis traveled through his brain, producing "essentially instantaneous unconsciousness and loss of function." He reported that Bettis died within minutes. Harlan further testified that at the time of his death, Bettis had a blood alcohol level of .27 grams percent and that his blood contained trace amounts of both diazepam and nordiazepam; in addition, a urine drug screen indicated the presence of tetrahydrocannabinol. Harlan explained that the amount of alcohol in Bettis' body would have significantly impaired his reaction time and altered his judgment.

Harlan also introduced an autopsy photograph showing blood coming from Bettis' mouth and nose. He explained that the blood was primarily the result of a hemorrhage in the oral and nasal pharynx that caused "a cough . . . or a gag reflex." Harlan explained that Bettis may have been coughing between the time he was shot and the time he stopped breathing and agreed that if a person had been standing above Bettis at that time, there would have been a substantial risk that the person would have been splattered with blood. He also testified that it was unlikely that a person standing fifteen to twenty feet away from Bettis at the time of his death would have gotten blood on him.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence presented at trial was insufficient to support his convictions, or alternatively, that the trial judge erred "in failing to exercise [his] power as '13th juror' in not finding that the State failed to prove all the essential elements of the crimes charged." Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914.

Having reviewed the record in this case, we conclude that sufficient evidence was presented at trial to support the Defendant's convictions. The State presented several witnesses who linked the Defendant socially to a "circle" of people who dealt marijuana, including Wayne

Cartwright and Mike Rhodes, with whom he was known to be friends. Evidence presented at trial also established that Summar and Bettis were known to be friends. In addition, the State presented evidence that before his death, victim Summar worked as a police informant and was named in an indictment against Cartwright.

Witnesses testified that both the Defendant and co-defendant Rhodes were upset that Summar had been working undercover with police. Doug Bicknell and Josh Summar both testified that the Defendant and Summar did not like each other. Bicknell quoted the Defendant as saying that Summar was a "punk" and that "he would see that the little punk would get what was coming to him" because of his involvement with police. Bicknell also quoted the Defendant as saying that "he let his gun do his fighting for him." Furthermore, Martin Rhodes stated that he had seen the Defendant with a .38 caliber handgun, the same type of weapon which was used to kill Bubba Summar.

On the evening of the murders, Summar informed friends that he and Bettis were to meet with Rhodes. He took a box of marijuana with him to the trailer. At the same time, Rhodes, who was intoxicated, and the Defendant discussed meeting Summar and then went to the trailer, where the victims' bodies were later found. Tabitha Rhodes testified when they returned, the Defendant and her husband pulled into her driveway on the night of the murders so quickly that they startled her. She stated that while her husband "rustl[ed] around on the floorboard," the Defendant "darted out to his car and left." Bettis' pistol was later found behind Rhodes' home. Tabitha Rhodes also reported that the Defendant told her, "it did not have to happen that way, that they drew on him first and he did what he had to do."

The Defendant's roommate, Donald Ivey, testified that when the Defendant arrived home on the night of the shootings, he immediately began to wash clothes while he ran water for a bath. When Ivey jokingly asked the Defendant whether he had killed someone, the Defendant first did not respond but later answered, "You can't help being in the wrong place at the wrong time; can you?" Furthermore, the medical examiner who performed autopsies on the victims' bodies testified that Bettis likely coughed up blood before his death and agreed that a person in close proximity to Bettis at the time would likely have been splattered with blood.

The Defendant himself admitted his presence at the trailer at the time of the shootings. He also presented inconsistent versions of the shootings to police, but insisted that his co-defendant Rhodes actually fired the shots that killed both victims. In addition, Lieutenant Detective Gage introduced an audio tape of a conversation between the Defendant and co-defendant Rhodes in which the Defendant made, among others, the following statements: "If nothing had ever been said, we'd be walking out today"; and "What was originally agreed on was if they had me, that you would take responsibility."

This was sufficient evidence from which the jury could have concluded that the Defendant conspired to commit and committed the first degree murders of the victims. See Tenn. Code Ann. §§ 39-13-202, 39-13-203. Furthermore, we conclude that the trial court properly exercised its

11

duty as thirteenth juror. Our supreme court has determined that "no explicit statement on the record is required by the trial judge that the [thirteenth juror] duty has been performed. . . . [and] where a motion for new trial is denied without a statement, an appellate court may presume that the trial judge approved the jury's verdict as the thirteenth juror." State v. Carter, 896 S.W.2d 119, 120 (Tenn. 1995). Thus, although the trial judge in this case did not make a statement on the record concerning his duty as thirteenth juror, we may presume that he approved the jury's verdict as thirteenth juror, and we find no error in his doing so.

## II. JURY CONTAMINATION

The Defendant next argues that the trial court erred by failing to grant his motions for mistrial concerning jury contamination made during the course of the trial. Specifically, he complains that James Albert Summar, Sr., father of victim Bubba Summar, approached and spoke with two prospective jurors and to a man who actually served as a juror in this case. He contends that these incidents violated his "right to an appearance of a fair trial, if not actually a fair trial."

During voir dire, one of the prospective jurors asked to speak with the judge and informed him in chambers that she had been approached by James Albert Summar, Sr. She reported that Summar approached her in the hallway outside the courtroom and said, "My son is dead because of that boy," referring to the Defendant. She stated that he also told her that "the other person that had been charged had already been tried and convicted." She then pointed out a second prospective juror whom she claimed to have also seen speaking with Mr. Summar. When questioned by the court, the second juror admitted that he had spoken with Summar. He stated that he shared his views on conspiracy and the death penalty with Summar but did not receive information from Summar. The first prospective juror was excused from service, and the second prospective juror was never called to serve.

During the trial, a trainee from the sheriff's department informed the court that on the first day of jury selection, she had seen Mr. Summar talking with a man who was later chosen to serve as a juror. She told the court that she was "pretty sure" that the man she had seen was juror Harold King, and she described him as having "back trouble." She claimed that she overheard Summar telling the juror that the Defendant had killed his son.

The trial court questioned juror King about the incident. King stated that he had asked Summar where the jurors were to stand on the first day of jury selection, but maintained that he had not further conversed with Summar. He also reported that he did not have "back trouble."

It is the law in Tennessee that an unexplained juror conversation with a third party is good cause for a new trial. State v. Parchman, 973 S.W.2d 607, 612 (Tenn.1997). When there is extraneous prejudicial information or any outside influence is brought to bear on a juror, the validity of the verdict is questionable. Id.

In <u>State v. Blackwell</u>, 664 S.W.2d 686 (Tenn. 1984), the Supreme Court adopted Rule 606(b) of the Federal Rules of Evidence and defined the type of evidence admissible from a juror to impeach a jury verdict. <u>See</u> <u>id.</u> at 688-90. This holding, subsequently established as Rule 606(b) of the Tennessee Rules of Evidence, prohibits a juror from giving testimony on any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon a juror's mind or emotion as influencing his or her vote. <u>See</u> Tenn. R. Evid. 606(b). However, the rule allows a juror to testify on the question of whether any extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. <u>See</u> <u>id.</u>

If it is shown that one or more jurors has been exposed to extraneous prejudicial information or improper influence, there arises a rebuttable presumption of prejudice, and the burden then shifts to the prosecution to explain the conduct or to demonstrate the harmlessness of it. <u>Parchman</u>, 973 S.W.2d at 612; <u>State v. Young</u>, 866 S.W.2d 194, 196 (Tenn.Crim.App.1992). In order to shift the burden to the prosecution to demonstrate the harmlessness of the communication with the jury, the threshold question is whether the statement communicated to the jury was prejudicial to the Defendant. <u>Parchman</u> at 612.

In this case, we conclude that the Defendant has failed to show prejudice resulting from the communications between Summar and members of the jury panel because neither of the prospective jurors who admitted to having been approached by Mr. Summar actually served on the jury. Furthermore, the Defendant has not demonstrated prejudice with regard to Mr. Summar's contact with juror King. King stated that he did not converse with Summar about the trial and did not receive information about the trial from Summar. In addition, although the sheriff's department trainee reported that the man with whom she saw Summar speaking had "back problems," King denied having any such problems. Moreover, the trainee could not conclusively identify the juror whom she saw speaking with Summar. It therefore appears that she may have been mistaken when she identified King as the juror. We find no error or abuse of discretion by the trial judge in refusing to grant a mistrial because of possible jury contamination.

### III. IMPROPER TESTIMONY

The Defendant next contests the admission of specific testimony by three different witnesses. He argues that Doug Bicknell should not have been allowed to testify that the Defendant "pulled [a] gun and said that he let his gun do his fighting for him." He also complains that Martin Rhodes was improperly allowed to testify that Mike Rhodes was to meet Bubba Summar at the trailer on the night of Summar's death. Finally, he argues that the trial court erred by allowing Tabitha Rhodes to testify that "Michael [Rhodes] was talking to [the Defendant] about going up to the trailer" to meet Summar on the night of the shootings.

The Defendant failed to object to Doug Bicknell's testimony at the time of trial. Failure to make a contemporaneous objection waives consideration by this Court of the issue on appeal.

13

<u>See</u> Tenn. R. App. P. 36(a); <u>State v. Killebrew</u>, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988). We conclude that this issue has therefore been waived.

The Defendant did object, however, to the testimony of Martin Rhodes and Tabitha Rhodes. The trial court allowed Martin Rhodes' testimony on the basis of Rule 803(3) of the Tennessee Rules of Evidence, the state of mind exception to the hearsay rule. The trial court overruled the Defendant's objection concerning Tabitha Rhodes' testimony after the State countered that the testimony showed motive and constituted statements made in furtherance of a conspiracy.

Rule 803(3) of the Tennessee Rules of Evidence allows admission of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . ." Martin Rhodes' testimony that his brother stated his intention to meet Bubba Summar at the trailer falls under this exception to the hearsay rule, and we thus conclude that the trial court properly admitted Martin Rhodes' testimony.

We also conclude that the trial court properly admitted Tabitha Rhodes' testimony that her husband told the Defendant of his intention to meet Bubba Summar at the trailer. Again, this testimony falls under the state of mind exception to the hearsay rule. Furthermore, we agree with the State that the testimony could have also been admitted under Rule 803(1.2) of the Tennessee Rules of Evidence. Rule 803(1.2) allows for admission of a "statement offered against a party that is . . . a statement of a co-conspirator of a party during the course of and in furtherance of a conspiracy." Tenn. R. Evid. 803(1.2)(E).

"[C]o-conspirator hearsay . . . may be admitted when '(1) the declaration was made in furtherance of the conspiracy; (2) it was made during the pendency of the conspiracy; and (3) there is independent proof of the existence of the conspiracy and the connection of the declarant and the defendant to do it.'" <u>State v. Hutchison</u>, 898 S.W.2d 161, 169 (Tenn. 1994) (quoting <u>State v. Hodgkinson</u>, 778 S.W.2d 54, 61 (Tenn. Crim. App. 1989)). Statements of a co-conspirator may be admitted when a conspiracy is shown by a preponderance of the evidence. <u>See</u> <u>State v. Stamper</u>, 863 S.W.2d 404, 406 (Tenn. 1993). In this case, as we have already concluded, the State presented sufficient evidence to establish the existence of a conspiracy. Moreover, the statement about which Tabitha Rhodes testified was made during the pendency of and in furtherance of the conspiracy. We therefore conclude that the statement was properly admitted under Rule 803(1.2) of the Tennessee Rules of Evidence.

## IV. UNFAIR TRIAL

The Defendant complains that the trial court erred "in its various ruling [sic] on objections made during the course of the trial," thereby denying the Defendant a fair trial. The Defendant fails to specify the objections or rulings to which he refers. Issues not supported by argument, citation to authorities, or appropriate references to the record are treated as waived. <u>See</u> Tenn. R.

Ct. Crim. App. 10(b). However, assuming for the sake of argument that the trial court did err in ruling on certain objections during trial, we are convinced by our review of the record that any such error is harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). This issue is without merit.

## V. CONTACT BETWEEN WITNESSES

The Defendant next contends that improper contact occurred between two witnesses who testified at trial, resulting in prejudice against the Defendant and a violation of his right to a fair trial. Donnie Ivey, the Defendant's roommate, reported to the trial court that before he testified, Josh Summar, victim Bubba Summar's brother, approached him outside the courtroom. At the time, Josh Summar had already testified. Ivey stated that did not realize he should not have been speaking with another witness and therefore told Summar what his testimony was to be. He maintained that he told Summar "exactly" the same information that he later shared in court and reported that his discussion with Summar did not affect his testimony in any way. Ivey also informed the court that after he testified, James Albert Summar, Sr., approached him outside the courtroom and asked, "What's this about blood?" He responded that he had not testified about blood.

Rule 615 of the Tennessee Rules of Evidence, commonly called the rule of sequestration, provides in pertinent part that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial . . . ." "The purpose of the rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). Although the rule does not provide for a sanction for its violation, prior to passage of the rule, "[t]rial judges had always been afforded wide discretion in determining whether to impose the sanction of excluding the evidence of a witness suspected of having violated the rule." State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

In this case, the Defendant moved for mistrial after Ivey reported to the court that he had spoken with Josh Summar. The trial court denied the motion, stating,

> Even if Mr. [Josh] Summar had tried to influence him, he wouldn't have known what to influence him about because their testimony – had they both been eyewitnesses or had they both known something about the same set of circumstances, I might have a different ruling, but we're talking about an entirely different set of circumstances.

From our review of the record, we are satisfied that no prejudice resulted from violation of the rule in this case. We believe that the purpose of the rule, to prevent one witness from influencing the testimony of another, was satisfied in this case. We therefore do not believe the trial judge erred by denying the Defendant's motion for mistrial.

## VI. TRANSCRIPT FROM CO-DEFENDANT'S TRIAL

The Defendant next argues that the trial court erred by failing to provide him with a free, complete transcript of his co-defendant's trial. He claims that the trial court thus denied him the opportunity to properly prepare for his own trial. He maintains that he needed the transcript to prepare for the direct and cross-examination of various witnesses and to develop his trial strategy.

It is well established that "an indigent defendant in a criminal prosecution must be provided with the tools of an adequate defense or appeal when those tools are available for a price to other defendants." State v. Elliott, 524 S.W.2d 473, 475 (Tenn. 1975). Among the tools generally provided is a free transcript of prior proceedings in the defendant's own case, "where the transcript [is] needed to vindicate a legal right." Id. at 476. "[T]he courts of this state have recognized that a trial judge has the authority to require a transcript of prior proceedings in [an] indigent defendant's own case be furnished to him if it appears that it is necessary in the interests of justice." Id. However, our supreme court has held that the "free transcript doctrine" does not extend so far as to guarantee an indigent defendant the transcript of testimony in a third party's trial. Id. Thus, we conclude that in this case, the Defendant did not have a "right" to a free transcript of his co-defendant's trial, and we find no error or abuse of discretion in the trial court's denial of the transcript. In addition, we conclude that the Defendant has not demonstrated how he was prejudiced by such denial.

## VII. SENTENCING

Finally, the Defendant argues that the State improperly questioned a witness at the sentencing hearing, "inflam[ing] the trial judge so as to prejudicially affect [his] sentence." Lucy Kilburn, who prepared the Defendant's presentence report, testified at the sentencing hearing. On cross-examination, defense counsel questioned her about two letters of reference from the Defendant's employer at the Northeast Correctional Center, where he is incarcerated. He also questioned her concerning two certificates, one for the completion of a Bible class and the other for completion of an anger management course. On redirect, the State asked Kilburn whether she was "aware of the fact that [the Defendant] was stabbed while he was in prison." Kilburn responded, "I had heard that," and immediately after her response, the trial judge sustained the objection.

Contrary to the Defendant's contention that the question was "intended to inflame the trial judge and influence his decision" regarding sentencing, it appears that the State was simply exploring claims about the Defendant's good behavior while incarcerated which were raised on cross-examination. In any event, the trial judge promptly sustained the Defendant's objection, and we find no evidence that the question prejudicially affected the Defendant's sentence in any way.

The Defendant further argues that "it was error to sentence the [Defendant] to the maximum twenty-five years on the Conspiracy conviction and respectfully requests a downward departure." The trial judge applied nine enhancement factors and no mitigating factors. The

16

Defendant contests only the application of enhancement factor (2), that the "defendant was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2).

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

We find no error in the trial court's imposition of a twenty-five year sentence for criminal conspiracy to commit first degree murder. The trial court considered the relevant sentencing principles, facts, and circumstances in sentencing the Defendant. From our review of the record, we conclude that there is ample support for the sentence imposed and therefore affirm the judgment of the trial court.

The judgment of the trial court is accordingly affirmed in all respects.

David H. Welles, Judge

Thomas T. Woodall, Judge

L.T. Lafferty, Senior Judge