IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 14, 2002 Session

## JACQUELINE McKINLEY v. SAMUEL SIMHA, M.D., ET AL.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. 98574 T.D.    The Honorable George H. Brown, Jr., Judge**

---

**No. W2001-02647-COA-R3-CV - Filed December 31, 2002**

---

Patient brought medical malpractice action against physician and medical group for complications that allegedly arose from injury to patient's right ureter suffered during total abdominal hysterectomy performed by defendant physician. The trial court denied defendants' Motion for Directed Verdict on the issues of cause and permanency of patient's condition. The trial court entered judgment on jury verdict for patient and subsequently awarded prejudgment interest to patient. Physician and medical group appealed. We affirm the trial court's denial of the directed verdict motion and its judgment on the jury verdict, and reverse the court's award of prejudgment interest.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Buckner Wellford and John Dotson, Memphis, For Appellants, Samuel Simha, M.D. and Health First Medical Group

William B. Raiford, III, Clarksdale, Mississippi, For Appellee, Jacqueline McKinley

### OPINION

The is a medical malpractice case involving complications arising from a total abdominal hysterectomy. On January 13, 1998, plaintiff Jacqueline McKinley ("McKinley") underwent a total abdominal hysterectomy and right salpingo-oopherectomy for treatment of abdominal pain caused by uterine fibroids.[1] The procedures were performed by defendant Dr. Samuel Simha ("Dr. Simha"),

---

[1] The procedures performed by Dr. Simha on January 13, 1998 were sufficiently explained, for the purposes of this case, in defendants' brief to this court.

(continued...)

a physician with defendant Health First Medical Group ("Health First").[2] At the time of the surgery, McKinley was a 35 year-old woman with a history of painful abdominal cramps, excessive uterine bleeding, and three cesarean section surgeries.

McKinley was discharged on January 15, 1998, and returned for a scheduled post-operative visit on January 21, 1998. During this visit, McKinley reported that she had not had a bowel movement since the January 13 procedure, and was suffering from a sharp pain that shot from her rectal area to her lower back. Dr. Simha prescribed the pain medication Darvocet and suggested that McKinley try herbal laxatives for her constipation.

On January 30, 1998, McKinley presented to the Baptist Hospital Emergency Room with complaints of abdominal pain, nausea, vomiting, flank pain, and constipation. A CT of McKinley's abdomen was performed, and the results revealed a 7 by 8 centimeter collection of fluid within McKinley's pelvic cavity. Dr. Simha initially determined that the fluid collection was a possible abscess. After further analysis, Dr. Simha concluded that the fluid was urine. Dr. Simha consulted urologist Dr. R. Elliot ("Dr. Elliot"), who diagnosed McKinley's condition as a likely utero-vaginal fistula – "a connection between the ureter (the tube carrying urine from the kidney to the bladder) and the vagina, causing leakage of urine into the vagina."

In an attempt to further diagnose McKinley's condition, Dr. Elliot performed a cystoscopy and right retrograde pyelogram. According to Dr. Elliot's operation report of February 1, 1998, the cystoscopy procedure "showed complete obstruction of the right ureter about 3 centimeters above the ureterovesical junction." This report also indicated that Dr. Elliot was unsuccessful in his attempt to pass a guidewire into McKinley's right ureter and by the obstruction. A nephrostomy tube was inserted into McKinley's right kidney through an incision in her skin to drain the collected urine from plaintiff's kidney through a tube, into a plastic bag.

On February 3, 1998, Dr. Thomas Hodgkiss ("Dr. Hodgkiss"), an interventional radiologist, attempted to bypass the occlusion by threading a stent through the nephrostomy tube, into McKinley's right kidney, and down into her right ureter. Believing the procedure to be a success, Dr. Hodgkiss removed the nephrostomy tube and discharged McKinley. Two days later, McKinley again presented to the Baptist Memorial Hospital Emergency Room with complaints of abdominal pain, flank pain, and constipation. A CT of McKinley's abdomen revealed a 12 cm collection of urine within plaintiff's abdomen. According to a report from the hospital's Department of

---

[1](...continued)
> A hysterectomy involves the surgical removal of the cervix and uterus. In this case, the surgery was performed as an open abdominal procedure (the surgery can also be performed laproscopically and vaginally). A salpingo-oopherectomy involves surgical removal of the ovaries and fallopian tubes. In this case only the right ovary and fallopian tube was removed.

[2] Dr. Simha was assisted by Dr. Laura Reinertson ("Dr. Reinertson"), a senior level medical resident.

Radiology, the stent had exited the existing hole in the ureter and was draining into the abdomen instead of the bladder.

A second nephrostomy tube was inserted into McKinley's right kidney to drain urine. After a lengthy hospital stay, McKinley was discharged with orders to return for removal of the stent. McKinley returned for this procedure as instructed, but the operation proved unsuccessful. Although a portion of the stent was removed, a segment of the stent detached and remained lodged in McKinley's abdomen. Due to the failure of these procedures, the nephrostomy tube was not removed, as it was the only means to expel urine from McKinley's body.

The nephrostomy tube remained in place for approximately three months. During this time, urologist Dr. Stephen Eppel ("Dr. Eppel"), monitored McKinley's condition. On May 21, 1998, Dr. Robert Wake ("Dr. Wake"), a urologist specializing in endoscopic kidney surgery, dislodged the remaining portion of the stent from McKinley's abdomen. Nearly one month later, on June 12, 1998, Dr. Roger Dmochoski ("Dr. Dmochoski") and Dr. Wake performed right ureter reimplantation surgery on McKinley.[3] The procedure successfully restored McKinley's right ureter function.

Following the June 12, 1998 surgery, McKinley renewed her complaints of constipation to Dr. Wake. Dr. Wake referred McKinley to Dr. Thomas Abell ("Dr. Abell") for further evaluation. Under Dr. Abell's care, McKinley underwent biofeedback training. McKinley visited Dr. Abell in 2000 for treatment.

McKinley testified that despite this treatment, she still suffers from constipation and urinary drip. She noted that she takes two enemas a day, suffers from daily bouts with nausea and vomiting, and is forced to wear Serenity pads as a preventative measure against the messes caused by urinary drip.

On December 17, 1998, McKinley filed a complaint against defendants alleging that Dr. Simha negligently sutured and ligated her right ureter, "and/or was negligent in failing to recognize and repair the damage to the ureter during the operation."[4] McKinley further asserted that she suffered physical, mental, and emotional anguish, and was subjected to significant medical expenses, loss of income, loss of enjoyment of life, and potential future health complications, as a direct and proximate result of Dr. Simha's alleged negligence.

Defendants filed an answer to McKinley's complaint, admitting that McKinley suffered complications "that may have been related to" the surgical procedure performed by Dr. Simha. Defendants denied that such injuries were caused by the suture ligation or laceration of the ureter

---

[3] Dr. Kleier testified that the procedure conducted on June 12 was ureteral implantation surgery, not right ureter reimplantation, as McKinley's uterus was actually removed during the operation. Defense counsel noted that the hospital charts for the June 12 surgery erroneously described the operation as a right ureter reimplantation.

[4] McKinley's complaint charges Health First with negligence on the basis that Simha's allegedly negligent actions were committed while Simha was an employee of Health First, acting within the scope of his employment.

during the hysterectomy, and further denied that these injuries, even if related in some manner to the surgery, were caused by any negligent act or omission of Dr. Simha.

After submitting their initial pleadings, both parties filed several motions in limine. Defendants' first motion in limine sought to preclude McKinley's standard of care expert, Dr. E.B. Kleier, from testifying on the basis that "Dr. Kleier lacks the experience to qualify as an expert witness pursuant to T.C.A. § 29-26-115, and that his testimony would not substantially assist the trier of fact in the [sic] deciding the issues in this case."[5] McKinley filed a response opposing defendants' motion in limine to preclude Dr. Kleier's testimony, asserting that there is nothing within T.C.A. § 29-26-115 that requires the expert to perform the actual procedure at issue within the year preceding the date that the alleged injury or wrongful act occurred. Defendants filed a second motion in limine for the purposes of excluding the causation testimony of plaintiff-expert Dr. Abell, on the basis that "[t]he opinion testimony elicited from Dr. Abell is so equivocal, so lacking in certainty that it is inadmissible."

On June 12, 2001, the trial court entered an order on all of the motions in limine. The order denied defendants' motion to preclude Dr. Kleier's testimony on the basis of lack of competency pursuant to T.C.A. § 29-26-115. The court further ruled that:

> Defendant's motion to exclude the causation testimony of Dr. Thomas Abell, as presented by evidentiary deposition, on the grounds that Dr. Abell failed opine [sic] to the degree of probability required by T.C.A. § 29-26-115, and the supporting case law, should be denied at this time. The Defendants may renew their motion after the testimony of Dr. Kleier.

A jury trial began on June 12, 2001, and at the close of testimony, defendants moved for a directed verdict on the issues of causation and permanency. Specifically, defendants asserted that McKinley had failed to present a material issue of fact as to the permanent nature of McKinley's constipated condition, and whether McKinley's complaints of chronic constipation were caused by the negligent act or omission of defendants. The trial court denied defendants' motion as to both issues.

---

[5] T.C.A. § 29-26-115(b) (2000) provides:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

On June 21, 2001, after five and one-half days of trial and approximately one and one-half days of deliberation, the jury, through a written note to Judge Brown, informed the court that they were unable to reach a unanimous verdict. The court, without the knowledge or input of the attorneys, instructed the jury to resume deliberations.

Later that same day, the parties, through counsel, were advised by the court that the jury still had not reached a unanimous verdict. The court informed counsel that he had directed the jury to discontinue deliberations for the day and return the following morning. According to the Affidavit of juror Jana Watson ("Watson"), the judge's direction was met with some discontent:

> Near the end of the jury's deliberations on Thursday, June 21, however, it is true that one juror stated something to the effect that if we were compelled to resume our deliberations on Friday she might "have to bring her gun with her" or words to that effect.

Concerned that one of her fellow jurors was upset by the "threatening" statement, Watson left a phone message with the General Sessions Clerk's office before the court convened on June 22, indicating that one of the jurors deliberating in the case had made a comment about bringing a gun to court.

The following morning, Friday, June 22, 2001, the jurors were individually subjected to a heightened screening process before entering the courthouse. Upon learning of the phone message of the previous evening, defense counsel immediately moved for "a mistrial on the basis that a threat of violence being insinuated [into] the deliberation process. I don't think that a fair deliberation can go forward with that being true and we would move for a mistrial on that basis."[6] The trial court denied the motion.

Upon learning that the jury was prepared to announce its verdict in court, counsel for defendants again addressed the court, moving that when the jury returns its verdict that the jury be polled individually as to whether the verdict was their own and polled individually concerning their knowledge of the facts and circumstances involving the alleged threat. The judge reiterated his certainty that the jurors were aware of the comments, and proceeded to call the jury into the courtroom.

The jury returned a verdict in favor of plaintiff, McKinley, awarding damages in the amount of $300,000.00.

On June 26, 2001, the court entered "Judgment on Jury Verdict." McKinley then filed motions seeking to recover discretionary costs and prejudgment interest "at the statutory rate of ten

---

[6] In their brief to this court, defendants assert that, at the time defense counsel moved for mistrial, he believed that the message was left by an anonymous caller, unaware that Watson had identified herself in the message.

percent (10%) per annum dating back to the date of the Defendant's negligent act, January 18, 1998 until entry of this Court's judgment, June 26, 2001...."

Defendants filed a Motion for New Trial, or Alternatively, Motion for Judgment Notwithstanding the Verdict. On October 5, 2001, the court ruled on the parties' motions in separate orders. The court granted McKinley's motion for prejudgment interest:

> Plaintiff is awarded (50%) percent of the maximum statutory rate permitted under applicable state law, computed from the time of the filing of this Complaint, December 17, 1998, to the time of the entry of the judgment, on June 26, 2001. This interest is to be calculated on the amount awarded by the jury, Three Hundred Thousand and 00/100 ($300,000.00) Dollars.

The court denied defendants' Motion for New Trial, or Alternatively, Motion for Judgment Notwithstanding the Verdict, and further enjoined defendants from communicating with jurors on the subjects raised in the Motion for New Trial. The court also granted McKinley's Motion for Discretionary Costs.

Defendants appeal and present the following issues for review: (1) Whether the trial court erred in denying defendants' motion for mistrial; (2) Whether the trial court erred in permitting the jury to deliberate on the "inherently speculative and contradictory testimony" of McKinley's standard of care expert, Dr. Kleier; (3) Whether the trial court erred in denying defendants' Motion for Directed Verdict "on the issues of permanent injury to the plaintiff and whether or not the plaintiff had created a fact issue as to whether her chronic constipation was caused by a negligent act or omission on the part of Dr. Simha;" (4) Whether the trial judge failed to perform his duty as the thirteenth juror; and (5) Whether the trial court erred in granting McKinley's Motion for Prejudgment Interest.

**I.**

The first issue presented for review is whether the trial court erred in refusing to grant defendants' motion for mistrial. At the core of defendants' argument is their assertion that the trial court erred in its failure and refusal to poll the jurors individually regarding their knowledge of a co-juror's threatening comments, and the impact of the gun threat on the deliberation process.

We first note that defendants' counsel made application for a poll of the jury when it was learned that a verdict had been reached and the jury was ready to report. We quote from the record:

> MR. DOTSON: Your Honor, I understand the jury has a verdict, but I would like to address the Court on this before they come out. Regardless of which way the verdict is, I make this motion, your Honor, before I know what it is, or this request, that the jury be polled individually if that is their verdict and also that the jury be polled

individually to ask them are they aware of the facts and circumstances involving the telephone threat that was made.

THE COURT: The answer to that is going to be yes because we went through a process to make sure that this whole judicial process would not be compromised by that, so the answer to that will be yes, I can tell you that already.

MR. DOTSON: So there is no dispute that each one of the jurors is aware of the telephone threat?

THE COURT: Isn't that right?

THE SHERIFF: Yes.

THE COURT: Yes. Did we put on the record the sheriff's comments and my impressions?

MR. RAIFORD: Yes, your Honor.

THE COURT: That is why I wanted to close the door to see whatever else you lawyers wanted me to do to make sure because I don't want that situation to have a taint on their decision because I don't think it ought to, and if I thought it did, I would have in a heartbeat taken appropriate action.

MR. DOTSON: That is my request, your Honor, those two things are my request.

THE COURT: I'll go a step further, I may ask them some other questions related to that, but they will be general questions to the panel, does that address generally what you are talking about?

MR. DOTSON: I don't know what the Court anticipates asking them.

THE COURT: I may want to ask them did any of this matter have an effect on their decision.

MR. DOTSON: If "this matter" is described in detail sufficient ot know what –

THE COURT: I can't describe it because the only thing that I know, please appreciate, is that A told B told to C and all I knew this

morning that there was – I'm trying to convey to you all that we don't take any kinds of calls, whether they are cranks or what have you, lightly. Out of an abundance of caution, we typically overreact in an interest of safety, rather than to underreact, and so this situation is no exception, so our actions are probably likened to hitting the ant with a sledge hammer. We would rather do that and make sure that we crush the ant than not, you know, that is our duty to everybody.

MR. DOTSON: There are two areas of concern and the first area has been addressed very well by the Court and by the police officers that were here and one is the threat of actual violence, the potential for actual violence which I think has been addressed very thoroughly.

THE COURT: Let me respond to that. I'm saying to that, and the court officers are here for the record and they have more firsthand knowledge – let me tell you how we operate for the record. The court officer in a case like this, a two- or three-day trial, will have intimate knowledge of the jurors individually and as a group, so I rely on them and they are trained to do certain things, that is why we had this argument you might have seen in the paper about them putting some rent-a-cops over here and that is the very reason why I was not going to convene court with a rent-a-cop, I think this is a good example because if the situation arose like this, I wanted somebody that would be trained to know what the appropriate course of action to take in this situation and from a prophylactic standpoint, not after something has happened, so I'm saying the court officer has a responsibility to protect us all, and so to that extent, she called someone else to make sure that out of an abundance of caution that took place.

The second thing is, she has her own personal observations and impressions of the jurors much more than I do. It just so happens that in this case, for the record, each of us in the court has had and still has a positive assessment of the jurors, in other words, they were surprised that this allegation was made involving one of them, is that a fair statement?

THE SHERIFF: That is fair.

THE COURT: So what I'm saying is, all of us are satisfied that, fortunately, this was nothing, but at this point, I'm dealing with it because I want to nip anything from a post-trial basis in the bud at this point so that the record is satisfied and that if you all do anything

-8-

later, then this issue would have been dealt with thoroughly so it would not have a cloud on whatever decision that this jury will make.

MR. DOTSON: I appreciate all the Court's comments and I renew my request for the polling of the jury on those two questions.

THE COURT: The answer is, they know about it, so bring the jury in.

(Whereupon, the jurors entered the courtroom at approximately 11:07 a.m.)

THE COURT: Good morning, ladies and gentlemen of the jury. Before the Court reads the jury verdict, this morning the Court was advised, I don't know how to characterize it, of an alleged telephone call alleging that one of the jurors might come to deliberations armed with a gun this morning. As a result of that, we took precautions to, number one, make sure that each of you were taken through the metal detector to assure that situation was not true and I hope you appreciate us operating in this kind of a arena, so out of an abundance of caution, steps have to be taken from time to time to make sure that everyone is safe, and if you were inconvenienced or if you felt put upon, I apologize, but please understand that in this day and time, it's better to be safe than sorry and it's to that extent that unusual precautions were taken to make sure that that situation was not true and would not have an effect on the safety of you and others that are around, so that is why we did that and that is why you may see more sheriffs around than we normally have.

The second concern that the Court has is the question of whether or not that or anything related to that had any effect on the decision that the jury has made in this case that I have yet to read publicly, in other words, if any situation, anything has occurred, been said or anything that has been done to you or has affected your decision in this case, that is the first question that I am asking. If anybody did not understand that question, please raise your hand.

(No response)

THE COURT: Seeing no hands, I want to first poll the jury if there is anything that was said, done, heard or felt or experienced that affected your decision in this case?

(Unanimous answer: No, sir.)

-9-

T.C.A. § 20-9-508 (1994) provides:

> **20-9-508. Poll of jury on request.** - The trial judge in all courts of record in which suits are tried by juries, in both criminal and civil cases, shall be required to poll the jury on application of either the state or the defendant in criminal cases and either the plaintiff or the defendant in civil cases, without exception.

Compliance with the statute requires that the jurors be questioned individually concerning the verdict. *See Dixon Stave & Heading Co. v. Archer*, 40 Tenn. App. 327, 291 S.W.2d 603 (Tenn. Ct. App. 1956). Polling of juries upon request is mandatory under T.C.A. § 20-9-508 (1994). *See Lovell v. McCullough*, 439 S.W.2d 105 (Tenn. 1969). In the instant case, the defendants made application for the poll of the jury to be made after the verdict was reported. Defendants contend that "[t]he trial court's failure and refusal to make a reasonable investigation in open court as to the circumstances of the threat of violence and its impact on the jury's deliberations is reversible error." As support for this position, defendants note that the jury was exposed to extraneous information at a point where the jury was deadlocked in its deliberation, and despite the trial judge's assurances that the jury was not unduly influenced, the law imposed a duty upon the trial judge to conduct a thorough investigation and inquiry into potential prejudice resulting from the jurors' knowledge of the threat.

Under the circumstances present in this case, defendants argue that the trial judge's general polling of the jury as a whole was insufficient to reveal potential prejudice. Defendants take particular issue with the rationale offered by the trial judge in support of his decision to forgo individual polling. We quote the trial judge's rationale offered in the following exchange between the court and defense counsel at the hearing for defendants' Motion for New Trial.

> THE COURT: I can assure you that every step was taken, number one, to assure the safety of everybody in this courtroom, that's number one. Number two, every step was taken to poll the jury and the jurors to assure that nothing had influenced or impacted on their responsibilities. They were polled, I think we had a court reporter back there when that occurred, so you got that.
>
> MR. WELLFORD: They were polled but not individually.
>
> THE COURT: They didn't have to be – I was there, I was present, I looked at them.
>
> MR. WELLFORD: Yes, sir, yes, sir.
>
> THE COURT: And I was back there myself and looked at them.

MR. WELLFORD: We requested they be polled individually.

THE COURT: Listen to me. In addition to that there was I believe a police officer or somebody in law enforcement that was a part of this jury. Number five –

MR. WELLFORD: Deputy Jailer.

THE COURT: It was a deputy jailer, but at least it was somebody in law enforcement, so somebody that was sensitive to the whole issue of security. So there was nothing indicated by the Court's observation, by the sheriff's observations, by the clerk's observation or by the demeanor of these jurors that day that would indicate that, number one, that they knew anything about a threat or, number two, that they were even nervous about the fact that they had to be, number one, examined, questioned or had to go through extraordinary security measures.... So there was nothing about the alleged call that impacted on this jury in this Court's opinion and in the opinion of the jurors at the time the court questioned them. ***It was my judgment and my discretion. I didn't have to poll them individually. I polled them as a group, I looked at them, been looking at jurors for thirty years so I got some good idea based on the dynamics in the room as to whether or not the answers that were given in that instance were consistent with the body language that I observed.*** And what I'm saying to you and I'm saying on the record, I am satisfied that every party received a fair trial, that the fair trial and the jury's decision, at least based on what they said and the observation was not, or at most mini – it was not impacted by that situation so I am going to –

(emphasis added).

Defendants cite to Tennessee Rule of Evidence 606(b) and the Tennessee Court of Criminal Appeals' decision in *State v. Young*, 866 S.W.2d 194 (Tenn. Crim. App. 1992), as the basis for their conclusion that the law imposed a duty upon Judge Brown to individually poll the jurors regarding the verdict and the substance of each juror's individual awareness "of the facts and circumstances involving the telephone threat," once the judge learned of the threat and anonymous phone call. Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's

mental processes, *except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror*, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b) (2002) (emphasis added).

In *Young*, the Tennessee Court of Criminal Appeals affirmed the trial judge's entry of a jury verdict despite the alleged extraneous influence of bomb threats received at the courthouse during trial, on the basis that the trial judge sufficiently interrogated the jurors as to the prejudicial effects of the threats along the lines prescribed by *State v. Blackwell*, 664 S.W.2d 686 (Tenn. 1984), and Tennessee Rule of Evidence 606(b). *Young*, 866 S.W.2d at 196. While we agree that the trial judge has a duty to investigate the impact and influence of potentially prejudicial extraneous information upon a jury, we do not read Rule 606(b) or *Young* to require the judge to poll each individual separately.

Defendants do not specifically raise an objection to the failure of the trial court to poll the jury individually as to the verdict being their verdict, but rather focus upon the type of investigation made by the trial court as to the impact and influence of the alleged statement of the juror.

The decision of whether to grant a motion for mistrial is within the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb a trial court's denial of a motion for mistrial absent an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams,* 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

The affidavit of the juror presented by defendants does not indicate that the jury was influenced by the extraneous evidence, and there is nothing else in the record to indicate improper influence on the jury. While we cannot agree with the trial court's rationale concerning the court's duty in polling a jury, we find under the circumstances of this case that the trial judge did not abuse his discretion in failing to grant a mistrial.

## II

The next issue is whether the trial court erred in permitting the jury to deliberate on the basis of the "inherently speculative and contradictory" testimony of McKinley's standard of care expert, Dr. Kleier. As noted, defendants filed a pre-trial motion in limine to preclude Dr. Kleier from testifying as an expert witness on the basis that he lacked "the experience to qualify as an expert witness pursuant to T.C.A. § 29-26-115, and that his testimony would not substantially assist the trier of fact...." The trial court denied defendants' motion, and defendants renewed their objection to Dr.

Kleier's standard of care testimony in their Motion for Directed Verdict. The record reflects that defendants failed to object to Dr. Kleier's standard of care testimony at the time it was offered into evidence.

After examination of defendants' Motion for New Trial, or Alternatively, Motion for Judgment Notwithstanding the Verdict, and appellate brief, we interpret defendants' argument that Dr. Kleier's testimony was speculative to mean that Dr. Kleier's standard of care testimony was not properly supported under Rules 702 and 703 of the Tennessee Rules of Evidence. To quote defendants' argument directly from their brief:

> Under the circumstances, Dr. Kleier simply did not lay a sufficient factual predicate under Tennessee Rule of Evidence 702 or 703, on the basis of his own limited personal experience, unfamiliarity with medical literature, and lack of specific criticism of technique or judgment as exercised in this case, to warrant the introduction of his testimony.

At the close of proof defendant moved for directed verdict on the issues of causation and permanency as to McKinley's struggle with constipation. Defendants assert that they "moved for directed verdict on the grounds that Dr. Kleier's testimony did not warrant submission to the jury on the issue of standard of care in this case." We disagree. Although defense counsel clearly noted its concern regarding Dr. Kleier's standard of care testimony, Dr. Kleier's testimony is not essential to the argument of causation. While the standard of care is fundamental to determining whether defendants were negligent, whether Dr. Simha violated the standard of care is irrelevant to a determination of what actually caused McKinley's constipation. From our reading of defendants' Motion for Directed Verdict, we conclude that defendants sought an immediate verdict on the issue of causation, not the issue of negligence toward which Dr. Kleier's testimony was directed.

> Your Honor, we'd like to take up the directed motion [sic] verdict first. Actually, it's not a directed motion [sic] verdict on the whole case. It's a directed verdict motion on an aspect of the case, specifically, the aspect of the case that we addressed in our memorandum to you which I believe I handed to you yesterday on the constipation.
>
> \*           \*           \*           \*
>
> When we come to the cause of that [constipation], we would contend that the evidence presented to the – in this case from both Dr. Abell primarily, but also from Dr. Kleier who addressed the standard of care issues in that regard, doesn't rise to the level of certainty that is required to create an issue of fact.

*    *    *    *

> And then we get to Dr. Kleier who was brought on to bolster, because we brought this issue up in limine, but by that time Dr. Kleier had offered additional opinions by way of interrogatory answers, and we took his deposition and he came in and he testified and Dr. Kleier didn't add anything on certainty to Dr. Abell's deposition. He didn't even know that the pudendal nerve – he couldn't identify the nerve, and the other part of this case that is uncontroverted is that the pudendal nerve is the only nerve.

To testify as a standard of care expert in a medical malpractice action in Tennessee, the expert must satisfy the guidelines of T.C.A. § 29-26-115(b), quoted above in footnote 5. The record indicates that Dr. Kleier is a board certified physician and surgeon specializing in general surgery. Dr. Kleier testified that general surgery encompasses gynecological procedures such as the total abdominal hysterectomy performed on McKinley. During a ten year period spanning from 1980 to 1990, Dr. Kleier testified that he performed fifteen to twenty abdominal hysterectomies a year. On January 13, 1998, the date of McKinley's total abdominal hysterectomy, Dr. Kleier was practicing general surgery in Missouri.

Although Dr. Kleier testified on cross examination that he did not perform any total abdominal hysterectomies from 1993 through 2000, the record is clear that Dr. Kleier was practicing in a relevant specialty (general surgery), in a contiguous bordering state (Missouri), at the time of McKinley's operation. Therefore, Dr. Kleier met all of the required guidelines set forth in T.C.A. § 29-26-115(b).

Tennessee Rule of Evidence 702 governs testimony by medical experts. Under Rule 702:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

In arguing that Dr. Kleier was not competent to testify as a standard of care expert, defendants highlight Dr. Kleier's alleged unfamiliarity with medical literature on ureter injuries, and his limited personal experience with total abdominal hysterectomies during the ten year period preceding McKinley's surgery. Based on these shortcomings, defendants urge that Dr. Kleier's testimony was inherently untrustworthy.

We disagree with defendants' assertion and find that despite his relative unfamiliarity with the medical texts introduced by defendants during trial, and his nearly decade-long hiatus from total abdominal hysterectomy procedures, Dr. Kleier was sufficiently qualified to testify as to the

applicable standard of care for a physician performing a total abdominal hysterectomy in Shelby County, Tennessee, on January 13, 1998.  In his testimony, Dr. Kleier unequivocally states that the standard of care requires identification and location of the ureters, and demands that the surgeon operate within the accepted surgical planes of the abdomen.  Based on Dr. Kleier's education, training, and experience prior to 1980, we believe that Dr. Kleier was a qualified expert and that his medical opinion was capable of substantially assisting the trier of fact in determining the issue of negligence.  Taking into consideration Dr. Kleier's lack of direct experience from 1993 to 2000, and his relative unfamiliarity with the medical literature regarding ureter injuries caused by suture ligation, we are still persuaded that Dr. Kleier was sufficiently qualified and knowledgeable to testify as an expert regarding the applicable standard of care.

To briefly address any concern regarding the "speculative" nature of Dr. Kleier's standard of care testimony, we find evidence in the record that Dr. Kleier unequivocally states that the standard of care requires identification and location of the ureters, and demands that the surgeon operate within the accepted surgical planes of the abdomen.  Dr. Kleier further testified on cross examination that if a ureter is suture ligated by the attending surgeon during a hysterectomy, the surgeon's actions constitute malpractice and, consequently, a violation of the applicable standard of care.[7]  Taking into account the above testimony, we find that Dr. Kleier's testimony was not speculative in nature.

Defendants further argue that the court committed reversible error by allowing the jury to deliberate on the allegedly "contradictory" testimony of Dr. Kleier.  Specifically, defendants point out that Dr. Kleier offered deposition testimony in a 1994 lawsuit in Carroll County, Tennessee, that directly contradicted his opinion in this case that injury to a ureter during an uncomplicated hysterectomy is always the product of malpractice or negligence.  In the Carroll County lawsuit, Dr. Kleier testified on deposition that 'a patient may suffer a ureteral injury in connection with a hysterectomy without any deviation from the standard of care on the part of the surgeon.'

Defendants assert that Dr. Kleier's contradictory testimony should have been deemed inadmissible and precluded from consideration by the jury.  We disagree.  The fact that Dr. Kleier's 1994 deposition testimony, offered in a completely separate and unrelated lawsuit, is contradictory to the opinion offered by Dr. Kleier in the case at bar, alone is insufficient to remove the testimony from the consideration of the jury.  In fact, the jury is entitled to consider the inconsistent statements

---

[7] When questioned by plaintiff's attorney during redirect examination, Dr. Kleier offered the following testimony regarding his opinion as to whether a neurological injury that results in constipation complications to the patient, should occur during an "uncomplicated" hysterectomy.

> Q: (BY MR. RAIFORD) What is your testimony with regard to whether a nerve should or should not be injured in a hysterectomy that would lead to problems with constipation?
>
> A: If this condition that the gastroenterologist says she has is indeed true it is my opinion it would not be a consequence of an uncomplicated hysterectomy.

-15-

in assessing the credibility of the witness and determining the weight to be given their testimony. *See State v. Harris*, No. M2000-02143-CCA-R3-CD, 2001 WL 1218582, at *2 (Tenn. Crim. App. Oct. 12, 2001) (citing *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956)). All of defendants' objections to Dr. Kleier's testimony go to the weight of the evidence and not to admissibility.

For these reasons, we find defendants' second issue without merit.

### III.

Defendants' third issue for review is whether the trial court erred in denying defendants' Motion for Directed Verdict on the issues of the permanent nature of McKinley's chronic constipation and whether said condition was caused by a negligent act or omission on the part of Dr. Simha. When deciding a Motion for Directed Verdict, both the trial court and the reviewing court on appeal must look to all the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, and allow all reasonable inferences in favor of that party. The court must discard all countervailing evidence, and if there is any dispute as to any material fact, or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995). A directed verdict cannot be sustained if there is material evidence in the record which would support a verdict for the defendant under any of the theories the defendant had advanced. *Hurley*, 922 S.W.2d at 891; *Conatser*, 920 S.W.2d at 647.

At the close of proof, defendants made a Motion for Directed Verdict on the basis that the permanency and causation testimony of plaintiff's experts, specifically the permanency and causation testimony offered by Dr. Abell, and the causation testimony of Dr. Kleier, did not "rise to the level of certainty required" to submit such testimony to the jury. Defendants first attacked the foundation of Dr. Abell's causation testimony, claiming that Dr. Abell's inability to pinpoint the precise nerve causing McKinley's injury rendered his testimony mere speculation, as Dr. Abell could only speak in terms of possibility. Defendants next addressed the alleged inadequacy of the permanency testimony offered by Dr. Abell. Recognizing the uncontroverted proof of McKinley's urologic injury, defense counsel argued that regardless of this proof, plaintiff failed to present any evidence to suggest that the constipation from which she suffered was permanent in nature. Paraphrasing Dr. Abell's deposition testimony, defense counsel argued that the expert's opinion constituted mere speculation, insufficient to create a factual dispute as to the permanency of McKinley's constipation:

> Then we move on the constipation, that brings up Dr. Abell's testimony again, and I've got a copy of Dr. Abell's deposition I can give you and there's only about three-quarters of a page in which he talks about that, and I again will submit that if you look at the testimony that Dr. Abell gave on the question of permanency of that constipation condition, it does not rise to the level of certainty required to submit it to the jury....

*    *    *    *    *

I submit that that testimony – I don't know, he said I don't know three or four times. No one can say that she's going to get better, but that's the same as saying I don't know what's going to happen to her.

Taking the strongest legitimate view of the evidence in favor of McKinley, and allowing all reasonable inferences in favor of plaintiff as the nonmoving party, we find that the judge did not err in denying defendants' Motion for Directed Verdict on the issues of causation and permanency respectively.

An expert in a medical malpractice case is required to base his or her causation opinion upon a reasonable degree of medical certainty. **Kilpatrick v. Bryant**, 868 S.W.2d 594, 602 (Tenn. 1993) ("Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty.") (citing **White v. Methodist Hosp. S.**, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)). "[P]roof of causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have,' is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case." **Kilpatrick**, 868 S.W.2d at 602.

At trial, Dr. Abell's videotaped deposition was entered into evidence in lieu of his in-court testimony. Dr. Abell offered testimony as to his opinion regarding the cause and permanency of McKinley's constipation condition. In their brief to this court, defendants contend that Dr. Abell's causation testimony is too speculative to support McKinley's theory that plaintiff suffered an unspecified nerve injury as a result of the hysterectomy or post-operative care performed by Dr. Simha, and therefore should not have been allowed to go to the jury for consideration. Defendants note that the following exchanges between Dr. Abell and plaintiff's counsel, taken from Dr. Abell's deposition, constitute opinions based on mere possibility, and are thus "not sufficient to create an issue of fact for the jury to decide."[8]

> Q: As a result of all of the diagnostic tests, did you form an impression at that time as to what was going on and what the nature of her problems were?
>
> A: Well, at that point we were – we weren't looking at causation. I'm not sure we ever really looked at that but we were looking at – assessment was post surgical onset of nausea, vomiting, abdominal pain and inability to evacuate stools.
>
> *    *    *    *    *

---

[8] To present Dr. Abell's testimony in a fair and accurate context, we quote a more extensive portion of Dr. Abell's testimony than that offered in defendants' brief to this court.

Q: Doctor, based on the records you've reviewed, all the tests, all the studies, in your opinion, what would be the most likely etiology for the problems that she's currently having?

A: Well, it's, I mean – it's – I don't see any way that I would know that for sure. Anybody can get these illnesses. In talking with her, she denies any problems before her surgery, and she's certainly had a rough time postoperatively. You can't – this has been described postoperatively from either G.I. surgery, urologic surgery, and/or gynecologic surgery, and that would be, I think, quite likely but I don't know any way I could say that for sure.

\*              \*              \*              \*              \*

Q: I don't believe there's any dispute that there's a documented injury that occurred to the ureter. Would that be consistent with the type of injury and problems that she's having with her bowel?

A: You certainly can get that. I mean, and it's been – it's been described, and there's an animal model for that. What's – she also had, as I understand it, a fistula, and that can be part of the problems as well.

Q: Based on all of the records you've seen, did you see any other etiology other than the neurologic injury that occurred as a result of the surgery?

A: I haven't. I mean, that doesn't mean that that's for sure the cause, but certainly, for example, you look for diabetes, collagen vascular diseases, other diseases, and I haven't been able to find any evidence of any of those.

Q: Again on a more likely than not basis, would you say that it resulted as a result of a neurologic injury resulting from the injury to the ureter?

MR. DOTSON: Object to the form of the question.

THE WITNESS: Again, not being – not being a surgeon or a urologist, gynecologist, it may be difficult to comment, but certainly it's consistent – not inconsistent, maybe is the best way to, I can think of to say that.

In their brief to this court, defendants contend that Tennessee Rule of Evidence 703 warrants a "very specific and plausible explanation as to what nerve was injured and how it was injured." On this basis, defendants assert that Dr. Abell's conclusion that McKinley's constipation was caused by a dysfunction in the pelvic floor that could be attributed to a nerve injury was not "trustworthy" because Dr. Abell failed to identify the specific nerve, how it was injured, and how the alleged injury was causally connected to McKinley's constipation.

In response to defendants' attack on the trustworthiness of Dr. Abell's causation testimony, McKinley quoted several passages from Dr. Abell's deposition testimony to illustrate the certainty of Dr. Abell's opinion that plaintiff's constipation was due to a nerve injury likely caused by the negligent act or omission of Dr. Simha during surgery or post-operative care.

Q: And what was your interpretation of that test, Doctor?

A: Well, she was – had no sensation which is not a good thing to have, so that she couldn't feel when she had stool there, but she also couldn't tighten her sphincter muscle well, and my assessment was rule out neurologic disorder.

Q: And if you would, Doctor, speak up just a little.

A: Oh, sure. Rule out neurologic disorder, that's when we – whenever we see no sensation, there's probably a nerve that's been injured at some point....

\*          \*          \*          \*          \*

Q: What are the etiologies that would cause this?

A: Anything that interrupts the nerves. We think of the nerves as bits of wiring, sort of like a fuse panel box, and anything that interrupts that at any stage, and that can be a hundred different things, but most of them that we see are women, most of them are either childbirth injury, back injury or interabdominal injury from – I mean, injury isn't the right word, but injury from – associated with surgery.

\*          \*          \*          \*          \*

Q: And again, as far as the EMG test, does that document that there is in fact a neurologic nerve injury?

A: Well, yeah, I guess – certainly the EMG documents that the nerve is not working. Now, there can be a lot of reasons for that, but if for

example if she had diabetes which she doesn't, you could say well, it's due to diabetes or some other cause, but you can't say – just say it's consistent with neurologic injury, is all you can say.

Q: And again, as Mr. Dotson brought out, there are other possible etiologies for this. Did you see any other etiology based on any of the records or tests that you did?

A: I didn't.

Dr. Abell testified that in June and July of 1999, several diagnostic tests, including an anal EMG, a defogram, and an anorectal manometry, were performed on McKinley for the purposes of assessing plaintiff's complaints of "post surgical onset of nausea, vomiting, abdominal pain and inability to evacuate stools." Based on the results of these tests, Dr. Abell was able to rule out neurologic disorder as a possible cause. Dr. Abell further testified that, based on all of the records he had studied regarding McKinley's medical history and complaints, the neurologic injury that allegedly occurred as a result of plaintiff's hysterectomy or post-operative treatment was the only etiology for which he found evidence.

Recognizing that Dr. Abell identified McKinley's constipation as consistent, or "not inconsistent," with a neurologic injury resulting from injury to plaintiff's ureter, we find that plaintiff has presented sufficient evidence to create an issue of fact as to whether McKinley's constipation was caused by a nerve injury. Although Dr. Abell was unable to conclusively link the injury to a negligent act or omission of Dr. Simha committed during operative or post-operative care, we are convinced that his testimony is at least minimally sufficient to create a factual issue as to causation.

Considering Dr. Abell's causation testimony in its entirety, we find that McKinley has satisfied her burden of creating an issue of fact as to the question of causation. Although Dr. Abell did not specifically identify the injured nerve or precisely define how the nerve was injured, we must take the strongest legitimate view of the evidence in favor of McKinley, recognizing that the jury must give the evidence such weight, faith and credit it deserves. Dr. Abell's testimony was sufficiently certain to satisfy Tennessee Rule of Evidence 703 and present a legitimate factual dispute precluding a directed verdict.

Defendants also assert that the causation testimony offered by Dr. Kleier failed to rise to the level of certainty required of expert testimony under T.C.A. § 29-26-115. Prior to trial, the parties entered a written stipulation into the record stating that Dr. Kleier, unless questioned by defense counsel on cross examination regarding the issue of causation, would not testify "as to whether the hysterectomy, the interventional radiology procedures or urologic procedures performed on Ms. McKinley January 13, 1998 or thereafter was more likely than the other in causing injury to Ms.

McKinley as described by Dr. Abell in his deposition."[9]  On cross examination, defense counsel elicited an admission from Dr. Kleier that he did not know the exact location of the pudendal nerves – the nerves allegedly causing Ms. McKinley's constipation.  Defendants take issue with Dr. Kleier's "speculative" causation testimony, asserting that Dr. Kleier's testimony that Dr. Simha would have had to have deliberately cut the pudendal nerve to cause injury to said nerves during a total abdominal hysterectomy, despite Dr. Kleier's inability to locate these nerves, amounted to speculative testimony insufficient to create a fact issue as to whether McKinley's chronic constipation was caused by the negligent act or omission of Dr. Simha.

Based on the stipulation entered into the record, it is obvious that McKinley was not relying upon the testimony of Dr. Kleier to prove that defendants' alleged negligence was the proximate cause of plaintiff's constipation.  Therefore, even if Dr. Kleier's testimony is insufficient to create an issue of fact as to causation, defendants' Motion for Directed Verdict on the issue of causation was properly denied on the basis that Dr. Abell's testimony created an issue of fact as to whether McKinley's condition of chronic constipation was proximately caused by the negligent act or omission of Dr. Simha.  Regardless, we find that the trial court correctly allowed the jury to consider Dr. Kleier's causation testimony, as said testimony was elicited by defendants' counsel on cross examination.

Expert testimony offered to prove the permanency of a medical condition or injury must also be to a reasonable degree of medical certainty.  In his deposition, Dr. Abell testified that, although he could not predict whether McKinley's condition would improve, it was unlikely that she would ever fully recover:

> Q: Doctor, based on how she has progressed in the last year and the repeat tests that you've done, can you give us a projection of what you would expect in the future as far as how her condition is going to progress or will it improve at this point in time?
>
> A: I don't have any – I don't think anybody knows.  These disorders are not recognized for that long.  Nobody knows what's called a national history.  Worst case scenario, she could have – there is an animal model for hysterectomy in dogs that where they get a – what's called ascending neuropathy where these things progress, but I don't have any way to know whether that's going to happen or not.
>
> Q: Do you believe that she will actually improve from where she is today?

---

[9] During his direct examination testimony, Dr. Kleier clarified that he was not expressing any opinion as to the "exact etiology of Ms. McKinley's bowel dysfunction."

A: I just don't know. I don't think that she is likely to – you know, with neurologic injury it's kind of like a stroke, you know, you may recover some. That's why we do the physical therapy, but I don't think that you could say that she is going to get better.

Dr. Abell's deposition testimony also revealed that he perceived McKinley as "chronically ill" during the period spanning from July of 1999 until two weeks prior to his deposition:

Q: Just in terms of what her clinical situation was, how do you contrast how she was two weeks ago versus when you saw her in July of 1999?

A: Well, it's – you know, we only saw her a couple of times last year and we have pretty good documentation but she wasn't somebody that I saw very often. She – my recollection was that she looked like she had been chronically ill most of the – well, she had been chronically ill. I can't say if she was chronically ill all year or not because I didn't see her, but she certainly historically wasn't doing well with – due to the history, and like all patients like this is – she was wondering what she could do to get feeling better.

Coupled with McKinley's testimony that she has been unable to produce a bowel movement without the aid of enemas since February 1998, and her statement that she continues to take two enemas on a daily basis, we find that Dr. Abell's testimony as to the likelihood that McKinley's condition will not improve is sufficient to create a factual dispute as to whether McKinley's chronic constipation is a permanent complication.

Therefore, based on the above conclusions, we find defendants' third issue without merit.

**IV.**

The fourth issue presented for review is whether the trial judge failed to perform his duty as the thirteenth juror. Defendants contend that the following statement by the trial judge in denying their Motion for New Trial, denotes an implicit acknowledgment that the court "abdicated his responsibility to weigh the evidence independently and to act as a thirteenth juror."

...[I]t was a very difficult fact situation, it was a well tried case. There were credible experts on both sides... It was a well tried case and twelve people made the decision. Twelve other people may very well could have made a different decision.

When the trial court is called upon to act as the thirteenth juror upon the filing of a motion for a new trial, the trial court must be independently satisfied with the verdict of the jury.

-22-

*Cumberland Tel. and Tel. Co. v. Smithwick*, 112 Tenn. 463, 79 S.W. 803 (Tenn. 1904). The Supreme Court's opinion reads in part:

> The rule in civil cases is that, if the circuit judge is dissatisfied with the verdict of the jury, it is his duty to set it aside and grant a new trial, and that upon its being made to appear to this court, from statements made by the circuit judge in passing upon the motion for new trial, that he was really not satisfied with the verdict, it becomes the duty of this court, when it has acquired jurisdiction of the cause, to do what the circuit judge should have done; that is, to grant a new trial on the ground of the dissatisfaction of that judicial officer with the verdict. [Citations omitted.]
>
> *         *         *         *         *
>
> The reasons given for the rule are, in substance, that the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise – as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence, and, if he is dissatisfied with the verdict of the jury, he should set it aside....

*Id*. at 804-05.

If the trial judge, when acting as the thirteenth juror, simply approves the verdict without any comment, it is presumed by an appellate court that he has performed his function adequately. *Miller v. Doe*, 873 S.W.2d 346 (Tenn. Ct. App. 1993). Where the trial court makes comments in the course of reviewing a motion for a new trial, we will review those comments, but we do not review those comments to see if we agree with the trial court's reasoning but rather to determine whether the trial court properly reviewed the evidence and was satisfied or dissatisfied with the verdict. *Id*. at 347. If the trial judge makes comments which indicate that he has misconceived his duty or clearly has not followed it, this Court must reverse and remand the case for a new trial. *Id*.

To place the issue into proper context, we quote at length the trial judge's rationale for denying defendants' Motion for New Trial.

On the count of if you assert that the evidence does not comport with the jury's verdict I am going to deny your motion.

\*        \*        \*        \*        \*

No, Mr. Wellford, it was a very difficult fact situation, it was a well-tried case. There were credible experts on both sides. There was nothing about that trial in my opinion based on the performance of the lawyers and based upon the performance of the jurors or the witnesses that fell below any standard. It was a well-tried case and twelve people made the decision. Twelve other people may very well could have made a different decision. And one thing that this court does, the very first thing the court does after the court hears the decision the antennae goes up anticipating the post-trial motions and so that I will have some idea of how I feel not when you bring the motion a month later or two months later but based on what the court would have just heard in the trial and the decision that the jury made whether or not that comports with the proof.

Defendants isolate a mere fragment of the trial judge's statement and interpret it as an expression of willingness by the court to approve either verdict the jury could have rendered. As support for this argument, defendants rely heavily on a comparison between the Tennessee Supreme Court's decision in *Holden v. Rannick*, 682 S.W.2d 903 (Tenn. 1984), and the case at bar. Defendants' reliance upon *Holden* is misplaced.

In *Holden*, the Court determined that the following comments from the trial court, when considered as a whole, indicated that the trial judge misconceived his duty as the thirteenth juror.

> THE COURT: Well, of course, Mr. Jones, the Court doesn't substitute its judgment for that of the jury where the issue is fairly presented to the jury and in this case frankly I think it was. As I recall Dr. Rannick testified that this lady had an unholy and unnatural fear of having cancer.
>
> \*        \*        \*        \*        \*
>
> MR. JONES: May I ask if your Honor agrees with the verdict of the jury?
>
> THE COURT: Yes, I do. ***The Court as I say does not substitute its judgment for that of the Plaintiff [sic] I would just as readily have agreed with the verdict the other way***. The verdict neither way would have shocked the Court frankly. I thought the issues were very

-24-

fairly put to the jury. I thought each side had a fair and full day in court and the jury made its decision and I approved the verdict, expressly approved the verdict so I respectfully overrule.

*Id*. at 905 (emphasis added).

The Court reasoned that the trial judge's unequivocal statements that the court does not substitute its judgment for that of the jury, and that he would have also agreed with a contrary verdict, were "inconsistent with his duty to weigh the evidence and pass on the issues." *Id*. The Court said:

> The trial judge stated that he expressly approved the verdict. It appears from the context of that statement, however, that he approved the verdict because he felt that the case was fairly presented and he was not shocked by the verdict, rather than because he reached the same verdict as the jury after independently weighing the evidence and passing upon the issues. Twice the trial judge stated that the court does not substitute its judgment for that of the jury. Those statements reveal a mistaken belief on his part that he was under no duty to pass upon the issues.

*Id*. at 905-906.

From our reading of the trial judge's comments in the case at issue, we are unable to find that the judge improperly deferred to the judgment of the jury or failed to express exact approval of the rendered verdict. Unlike the trial judge in ***Holden***, the judge did not state that he could have just as easily approved a contrary verdict; instead, he merely suggested that another jury could have conceivably interpreted the difficult facts of this case differently. His statement, therefore, cannot be considered as an expression to accept either verdict. Moreover, the trial judge clearly notes his satisfaction with the verdict by stating that he would deny a motion premised on the argument that the evidence does not comport with the jury's verdict. The judge twice mentions the court's concern with evaluating whether the evidence comports with the jury verdict – a clear indication that he was well aware of his duty to independently weigh the evidence to ascertain whether a new trial was warranted.

Considered in their entirety, the judge's comments do not constitute a failure to carry out the duties required of a judge in his role as a thirteenth juror and, therefore, do not warrant a remand for new trial. The judge made no comments that could be construed as an inappropriate deferral to the jury's verdict or an unwillingness to invade the province of the jury. *Cf. **Miller v. Doe***, 873 S.W.2d 346, 348-49 (Tenn. Ct. App. 1993) (trial judge's statement that "I'm not inclined to interfere with the verdict of the jury..." deemed an impermissible deferral to the jury's verdict); ***Sherlin v. Roberson***, 351 S.W.2d 700, 701 (Tenn. Ct. App. 1976) (holding that trial judge's statement that he could not say the jury reached the right verdict amounted to impermissible deference to the jury's verdict as the judge was "disclaiming any opinion of his own"). Related to the concept of

inappropriate deferral, the record contains no statements by the trial judge to suggest that he misunderstood or was unaware of his duty to independently weigh the evidence on the record. *See Heath v. Memphis Radiological Prof'l Corp.*, 2001 WL 1381278, at *4 (Tenn. Ct. App. Nov. 6, 2001) (court's finding that there was no evidence in the record to indicate that the trial judge failed to conduct an independent review of the evidence strengthened by the fact that the judge never stated that he was "not at liberty to substitute his judgment for that of the jury, as in *Holden*"); *cf. Miller*, 873 S.W.2d at 349 ("There is nothing in this record to indicate that the trial court approved the verdict for the reason that he had independently weighed the evidence, had passed on the issues presented to the jury, and reached the same verdict as the jury did."). Finally, noting the judge's refusal to grant a Motion for New Trial that was based on an assertion that the evidence did not comport with the verdict, we are unpersuaded by the defendants' implication that the judge failed to voice an unequivocal approval of the jury's verdict simply because he recognized that a different jury could have arrived at a contrary conclusion. *Cf. State v. Pierce*, No. 02C01-9704-CC-00146, 1998 WL 92520, at *3 (Tenn. Crim. App. Mar. 5, 1998) (finding that the trial judge's statement as to his belief that the penalty was "unduly harsh" did not vitiate judge's unequivocal approval of the jury's verdict).

The record supports that the trial judge was duly aware of the duties required of him in his role as thirteenth juror, and we conclude that he sufficiently carried out these duties. This issue is without merit.

## V.

Defendants' final issue for review is whether the trial court erred in granting McKinley's motion for prejudgment interest. T.C.A. § 47-14-123 (2001) governs awards of prejudgment interest, providing:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; provided, that with respect to contracts subject to § 47-14-103, the maximum effective rates of prejudgment interest so awarded shall be the same as set by that section for the particular category of transaction involved. In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-103.

In *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998), the Tennessee Supreme Court set forth the standard of review and guiding principles for prejudgment interest awards.

An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. *Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found. *See State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978) (applying abuse of discretion standard to trial court's decision to deny request for suspended sentence), *cert. denied*, 439 U.S. 1077, 99 S. Ct. 854, 59 L. Ed.2d 45 (1979).

Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. T.C.A. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994); *Otis*, 850 S.W.2d at 446.

In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. *Mitchell*, 876 S.W.2d at 832. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds. *Id*. (citing *Textile Workers Union v. Brookside Mills, Inc.*, 205 Tenn. 394, 402, 326 S.W.2d 671, 675 (1959)).

*Myint*, 970 S.W.2d at 927.

At a hearing on defendants' Motion for New Trial, the trial court also considered McKinley's Motion for Prejudgment Interest. After accepting arguments from both parties, the trial judge decided to "cut the baby in half" and award prejudgment interest to McKinley in an amount equal

to one-half the legal rate from the time that the lawsuit was filed to the date of the trial. In an Order entered October 5, 2001, the trial judge granted the following award:

> Plaintiff is awarded (50%) of the maximum statutory rate permitted under applicable state law, computed from the time of the filing of this Complaint, December 17, 1998, to the time of the entry of the judgment, on June 26, 2001. This interest is to be calculated on the amount awarded by the jury, Three Hundred Thousand and 00/100 ($300,000.00) Dollars.
>
> Further it is the finding of the Court that if the Court is not permitted to award a percentage of pre-judgment interest, but rather constrained by law to order a full 10% assessment of pre-judgment interest or none at all, then it is the finding of the Court that the Plaintiff should be awarded the full statutory rate, 10%, of pre-judgment interest accrued from the date of the filing of this action, to the date of the judgment.

Defendants voiced opposition to the trial court's award, arguing against an award of prejudgment interest on the basis that the "amount of the obligation" was not certain or easily ascertained, the damages were "totally unliquidated," the evidence in the case was "hotly contested," and the defendant had a good faith basis to oppose plaintiff's suit. Under T.C.A. § 47-14-123, a court is authorized to award prejudgment interest where the statutory and common law of Tennessee, as it existed on April 1, 1979, allows such interest. In their brief to this court, defendants point to the Tennessee Supreme Court's 1891 decision in ***Louisville & N.R. Co. v. Wallace***, 91 Tenn. 35, 17 S.W. 882 (Tenn. 1891), as controlling authority for the position that prejudgment interest was not permitted in personal injury cases as of April 1, 1979. We agree.

In *Wallace*, the defendant-brakeman sustained personal injuries as a result of the alleged negligence of the plaintiff-employer. *Id*. The only material issue considered by the Court was the question of prejudgment interest. *Id*. Finding that prejudgment interest was not allowed as a component of damages in personal injury actions, the Court reasoned:

> The error of the Court below was in the assumption that a like measure of damages is applied in this class of cases as in that of injury to property effecting its destruction or conversion, or other unlawful or fraudulent misappropriation or detention of property or money, in which the rule applied by the Circuit Judge is held to be a proper one, not on the theory, even in this class of cases, that interest as such is due, but that the plaintiff is entitled to the fixed sum of money or definite money value of property converted or destroyed, and the jury may give *as damages* an amount equal to interest on the value of the property. But such rule applies alone to such cases, and

not to that of personal injury, which does not cease when inflicted, and is not susceptible of definite and accurate computation. It never creates a debt, nor becomes one, until it is judicially ascertained and determined. Only from that time can it draw interest; and interest or damages cannot at any preceding time be added to it without changing and superadding a new element, never given in this state or any other in a similar case, so far as our investigation has discovered.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Nevertheless it is in the region of tort that we find the clearest cases for disallowance of interest. There are many cases which are not brought to recover a sum of money representing a property loss of the plaintiff, and it is frequently said broadly that interest is not allowed in such actions. It is certainly not allowed in such actions as assault and battery, or for *personal injury by negligence*, libel, slander, seduction, etc.

17 S.W. at 883 (citations omitted) (emphasis added in bold).

*Wallace* has not been overruled and was the rule at common law on April 1, 1979.[10] For this reason, we find that the trial court committed an abuse of discretion in awarding prejudgment interest to McKinley. Moreover, the record indicates that, under the circumstances of the case at bar, the principles of equity weigh against an award of prejudgment interest to McKinley.

At the hearing on defendants' Motion for New Trial, defendants argued that prejudgment interest was inappropriate on the basis that the damages suffered by McKinley were unliquidated, the evidence in the case was "hotly contested," and the "defendant had a good faith basis to believe that the defendant was going to prevail." While we recognize the Tennessee Supreme Court's ruling in *Myint* that uncertainty as to the amount of damages, and the existence of a "reasonable basis on which to dispute liability,"do not mandate a denial of prejudgment interest, the award of damages in the instant case includes an award for pain and suffering and disabilities to date of trial and beyond trial.

The award of prejudgment interest in this case is not authorized by the statute.

Accordingly, the judgment of the trial court awarding prejudgment interest is reversed. The judgment in all other respects is affirmed. Costs of the appeal are assessed to appellants, Samuel Simha, M.D. and Health First Medical Group, and their surety.

---

[10] Our Supreme Court in *Railroad v. Fort*, 112 Tenn. 432, 456 (1903).

-29-

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.